607 So.2d 517 (1992)
Cleo Allen BUTLER, Individually and for and on Behalf of the Minor, Michelle Butler and Arlene Major as Custodian of the Minor, Michelle Butler,
v.
FLINT GOODRICH HOSPITAL OF DILLARD UNIVERSITY, Jerome T. Medley, Warren P. McKenna, Jr., M.D., Sandra Viglia, Joseph Braud, M.D. and Sherman Bernard in his Capacity as Commissioner of Insurance, et al.
No. 92 CC 0559.
Supreme Court of Louisiana.
October 19, 1992.
Dissenting Opinion November 10, 1992.
Rehearing Denied November 25, 1992.
Darleen M. Jacobs, Brian C. Beckwith, James L. Yates, New Orleans, for applicants.
Franklin D. Beahm, Katherine B. Muslow, Thomas, Hayes & Beahm, Lawrence L. McNamara, Philip O. Bergeron, Robert J. Conrad, Jr., Adams & Reese, New Orleans, C.T. Williams, Jr., J. Elliott Baker, Blue, Williams & Buckley, Metairie, for respondents.
Joseph W. Thomas, New Orleans, for Norward Sutton, Sr., amicus curiae.
Robert G. Pugh, Jr., Lamar P. Pugh, Pugh, Pugh & Pugh, Shreveport, for Louisiana Medical Mut. Ins. Co., amicus curiae.
Lawrence S. Kullman, New Orleans, David W. Robertson, Baton Rouge, for Louisiana Trial Lawyers Ass'n, amicus curiae.
George E. Cain, Bryan Misshore, Kelley A. Robichaux, Lemle & Kelleher, New Orleans, for Ins. Corp. of America, amicus curiae.
Richard P. Ieyoub, Atty. Gen., Athena B. Peidrahita, Asst. Atty. Gen., for State, amicus curiae.
Charles A. Boggs, Boggs, Loehn & Rodrigue, New Orleans, for Dr. Susan Jeanfreau, amicus curiae.
*518 Robert L. Roland, Peter T. Dazzio, P. Scott Jolly, Baton Rouge, for Louisiana Hosp. Ass'n and Louisiana Hosp. Ass'n Ins. Trust Fund, amicus curiae.
H. Evans Scobee, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for East Baton Rouge Parish Medical Soc., amicus curiae.
Larry M. Roedel, Roedel Parsons Forrester & Koch, Baton Rouge, for Louisiana Dental Ass'n, amicus curiae.
Marc W. Judice, Juneau, Judice, Hill & Adley, Lafayette, for The Ninth Dist. of Louisiana State Medical Soc., amicus curiae.
Cynthia C. Anderson, Gregg A. Wilkes, Cook, Yancey, King & Galloway, Shreveport, for Shreveport Medical Soc., The North Cent. Parishes Medical Soc., The Delta Medical Soc., and the Morehouse Parish Medical Soc., amicus curiae.
Jesse D. McDonald, Hudson, Potts & Bernstein, Monroe, for Louisiana State Medical Soc. and Ouachita Parish Medical Soc., amicus curiae.
Donna D. Fraiche, Michael M. Meunier, Elaine W. Selle, Locke Purnell Rain Harrell, New Orleans, for Orleans Parish Medical Soc. and The Jefferson Parish Medical Soc., amicus curiae.
Dissenting Opinion by Justice Dennis, November 10, 1992.
WATSON, Justice.
The issue presented is the constitutionality of Louisiana's $500,000 cap on general damages in a medical malpractice victim's suit against multiple defendants. LSA-R.S. 40:1299.42(B)(1).

FACTS
In May of 1976, a three year old child, Michelle Butler, had complications following eye surgery. After suffering cardiac arrest, she was rendered blind, paralyzed and retarded. Michelle's maternal grandmother, Arlene Major, was appointed tutrix. She and the minor's attorney released the Flint-Goodrich Hospital, a division of Dillard University, and its employee, Sandra Viglia Williams, a nurse-anesthetist, for $100,000. The minor's rights against other parties, including the Louisiana Patient's Compensation Fund, Dr. Jerome Medley, Dr. Warren McKenna, and Dr. Joseph Braud, were reserved. It is alleged that there is excess coverage on some or all of the other health care providers, but plaintiff's discovery was prohibited.
The trial court gave judgment against the Louisiana Patient's Compensation Fund for $400,000 and ordered the Fund to pay Michelle Butler's medical care and related expenses from April 27, 1990. Plaintiff was awarded $244,275 for past care. After tender of its $400,000 was refused, the Fund deposited that sum in the court registry.
Drs. Medley, McKenna and Braud filed a motion for summary judgment because Michelle had received the maximum $500,000 recovery allowed by LSA-R.S. 40:1299.42(B)(1). The trial court denied the motion. The court of appeal granted a writ and ordered that summary judgment be entered. This court granted a writ to review the ruling of the court of appeal.

LAW
The Louisiana Constitution mandates equal protection of the laws. Art. I, § 3. It prohibits arbitrary, capricious or unreasonable discrimination because of physical condition. Art. I, §§ 3 and 12. Open courts must provide an adequate remedy, administered without partiality, for injury to persons and property. Art. I, § 22.
Imperfections in legislation are not grounds for judicial intervention unless they result in denial of constitutional rights. James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Everett v. Goldman, 359 So.2d 1256 (La. 1978). Consistent with most other state supreme courts, Everett held that medical malpractice legislation does not infringe upon fundamental rights. See, for example, Condemarin v. University Hosp., 775 P.2d 348 (Utah 1989). Also see Tull v. United States, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) and Boyd v. Bulala, 877 F.2d 1191 (4th Cir.1989). Two provisions of the Louisiana Act were approved in Everett: *519 medical review panels and no demand for a dollar amount. Compare Hoem v. State, 756 P.2d 780 (Wyo.1988), which held that medical review panels deny equal protection.
Sibley I, Sibley v. Board of Sup'rs of Louisiana, 462 So.2d 149 (La.1985), held that limiting medical malpractice awards to $500,000 per patient does not violate the equal protection and due process guarantees of the state and federal constitutions or the state constitutional guarantee of access to courts. A rehearing was granted and those issues were given further scrutiny in Sibley II, Sibley v. Board of Sup'rs of Louisiana, 477 So.2d 1094 (La.1985), which rejected the federal three-tier system of scrutiny. Sibley II decided that the physical condition discrimination in Louisiana's medical malpractice act, between those more and less severely injured, must further a legitimate state interest. Sibley II remanded, ordering that the state's interests be balanced against the discrimination to determine if the legislative classifications were arbitrary, capricious and unreasonable. The case was settled.
After a Sibley II analysis, the fourth circuit found the cap valid in Williams v. Kushner, 524 So.2d 191 (La.App. 4th Cir. 1988). The evidence included testimony that some health care providers were "bare" of malpractice insurance before the passage of Act 817 of 1975. Williams v. Kushner, 549 So.2d 294 (La.1989), amended and affirmed the court of appeal opinion without a definitive holding on the constitutional issue. Williams confirmed the validity of the $400,000 cap on general damages from the Fund but pretermitted the question of limiting payment by an individual health care provider to $100,000.
Plaintiff's withdrawal of a doctor's $100,000 deposit in a court registry settled plaintiff's claim against the doctor. Ewing v. Aubert, 566 So.2d 616 (La.1990). Payment of $100,000 by one qualified health care provider triggers the Fund's liability for excess damages. Stuka v. Fleming, 561 So.2d 1371 (La.1990) cert. denied, 498 U.S. ___, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990). The Fund cannot contest liability when there is a settlement for $100,000 by a health care provider before or after trial. Koslowski v. Sanchez, 576 So.2d 470 (La.1991).
The fourth circuit again found the cap constitutional in LaMark v. NME Hospitals, Inc., 542 So.2d 753 (La.App. 4th Cir. 1989) writ denied, 551 So.2d 1334 (La. 1989). Despite the lack of an express decision from this court, the United States Fifth Circuit inferred that the cap meets Louisiana's constitutional requirements. Owen v. U.S., 935 F.2d 734 (5th Cir.1991) cert. denied, ___ U.S. ___, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992).
Under Louisiana's medical malpractice act, liability of multiple health care providers, to an aggregate exceeding $100,000, does not inure to the victim but reduces the excess due from the Fund. LSA-R.S. 40:1299.42(B)(3)(a). The total amount paid from multiple health care providers shall not exceed $500,000. LSA-R.S. 40:1299(B)(1) and (3)(b).
Since the Louisiana Act does not affect fundamental rights, the constitutional test is whether its provisions are reasonably related to furthering general social interests. Sibley II; Bazley v. Tortorich, 397 So.2d 475 (La. 1981).
Other state courts of last resort have addressed these constitutional issues.
Lucas v. United States, 757 S.W.2d 687 (Tex.1988), answering a certified question from the United States Fifth Circuit, concluded that a $500,000 limitation on medical malpractice damages unconstitutionally limited open access to the Texas courts. The legislation failed to provide an adequate substitute, a societal quid pro quo. Moreover, reducing recovery of persons catastrophically injured by medical negligence was arbitrary, because it had no rational relationship to the state's interests.
Smith v. Department of Insurance, 507 So.2d 1080 (Fla.1987), invalidated a $450,000 ceiling on noneconomic damages as an arbitrary cap denying constitutional access to the courts and the right to a jury trial.
Rose v. Doctors Hosp., 801 S.W.2d 841 (Tex.1990), decided that the $500,000 Texas *520 cap on damages for wrongful death, a statutory remedy, was valid. The wrongful death cap was distinguished and severed from the common law remedy for malpractice. However, the statutory cap on wrongful death damages was interpreted to allow excess damages to a plaintiff recovering against more than one defendant.
Alabama's $400,000 limit on noneconomic damages recoverable against physicians violates the constitutional guarantee of equal protection. Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991). Balancing the direct burden on catastrophically injured victims of medical malpractice against the indirect and speculative benefit to society, Moore found that any reduction of general health care costs was attenuated and remote, while the burden on those most severely injured by medical malpractice was immense. Also, the limitation on damages for noneconomic losses was an impermissible burden on the inviolate right to trial by jury guaranteed by the Alabama Constitution.
Moore criticizes a contrary opinion in Etheridge v. Medical Center Hosp., 237 Va. 87, 376 S.E.2d 525 (1989). Etheridge was also distinguished, because the Virginia Constitution (like Louisiana's) does not guarantee an inviolate right to a civil jury trial.
Many of the cases from other jurisdictions invalidate damage caps because of a state constitutional right to jury trial in civil cases. For example, Washington, Pennsylvania, Illinois, Ohio, Delaware and Florida have constitutional provisions which guarantee the right to civil jury trial, a provision lacking in the Louisiana constitution. See Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711 (1989); Mattos v. Thompson, 491 Pa. 385, 421 A.2d 190 (1980); Wright v. Central Du Page Hosp. Ass'n, 63 Ill.2d 313, 347 N.E.2d 736 (1976); Duren v. Suburban Comm'ty Hosp., 24 Ohio Misc.2d 25, 24 OBR 450, 495 N.E.2d 51 (1985); Lacy v. Green, 428 A.2d 1171 (Del.Super.1981); and Smith, supra. Compare the discussion of the Seventh Amendment's scope in Davis v. Omitowoju, 883 F.2d 1155 (3d Cir.1989).
The New Hampshire Supreme Court invalidated an $875,000 cap on noneconomic personal injury loss as a violation of state equal protection. Brannigan v. Usitalo, 134 N.H. 50, 587 A.2d 1232 (1991). The court had earlier nullified a $250,000 cap on noneconomic damages for medical malpractice. Carson v. Maurer, 120 N.H. 925, 424 A.2d 825 (1980).
Morris v. Savoy, 61 Ohio St.3d 684, 576 N.E.2d 765 (1991), held that a $200,000 cap on general damages for medical malpractice was unconstitutional on due process grounds. There was no evidence of a rational connection between excess awards and malpractice insurance rates and therefore no real and substantial relationship to public welfare. In addition, the statute was found to be unreasonable and arbitrary by imposing the cost of any benefit to the public upon a class consisting of those most severely injured by medical malpractice.
In answer to a certified question, the Supreme Court of Kansas decided that a $250,000 statutory cap on noneconomic tort damages did not violate the right to jury trial or due process, because there was a legislative quid pro quo. Samsel v. Wheeler Transport Services, 246 Kan. 336, 789 P.2d 541 (1990) (overruled on other grounds in Bair, infra). Kansas constitutionally eliminated vicarious liability for medical malpractice by providing an adequate substitute remedy, an assured fund of $3,200,000 for payment of damages. Bair v. Peck, 248 Kan. 824, 811 P.2d 1176 (1991).
West Virginia upheld a one million dollar medical malpractice cap on noneconomic loss. Robinson v. Charleston Area Med. Center, Inc., 186 W.Va. 720, 414 S.E.2d 877 (1991). Robinson applied its cap to the aggregated claims of a child and his parents, thereby eliminating recovery by the parents, secondary claimants. This interpretation accords with the language of the Louisiana statute, which applies the cap per patient.
Maryland caps noneconomic personal injury damages at $350,000. Murphy v. Edmonds, 325 Md. 342, 601 A.2d 102 (1992).
*521 Indiana's $500,000 medical malpractice cap on damages was declared constitutional in Johnson v. St. Vincent Hospital, Inc., 273 Ind. 374, 404 N.E.2d 585 (1980). Also see Cha v. Warnick, 476 N.E.2d 109 (Ind. 1985) cert. denied, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). Both Indiana and Louisiana have provided the alternative remedy of a patient's compensation fund. However, unlike Louisiana, Indiana has made no provision for payment of full medical care and related benefits to medical malpractice victims. See LSA-R.S. 40:1299.43(A)(1) and (3). Arneson v. Olson, 270 N.W.2d 125 (N.D.1978) noted that North Dakota's $300,000 cap might prevent some malpractice victims from recovering all their medical expenses.
In many states, the problem of uninsured physicians, unable or unwilling to buy insurance, resulted in statutes mandating coverage. See, for example, the statutes declared constitutional in McCoy v. Com., Bd. of Medical Ed. & Licensure, 37 Pa. Commw. 530, 391 A.2d 723 (1978); Kansas ex rel Schneider v. Liggett, 223 Kan. 610, 576 P.2d 221 (1978); and Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399 (1976) cert. denied, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Compare McGuffey v. Hall, 557 S.W.2d 401 (Ky.1977), which found a denial of equal protection. Participation in Louisiana's medical malpractice insurance plan is voluntary, but the plan does make insurance available to "qualified risks" unable to obtain private insurance. LSA-R.S. 40:1299.46. Compare the mandatory physician funding for birth-related neurological injuries established in Virginia. King v. Neurological Injury Comp. Program, 242 Va. 404, 410 S.E.2d 656 (1991).

CONCLUSION
This court decided two threshold issues in Williams v. Kushner, 549 So.2d 294 (La.1989). The liability of the settling health care provider is moot, and limitation of the Fund's liability to $400,000 is constitutional. We now hold that the $500,000 cap on medical malpractice judgments is also constitutional.
Although a subject of debate, the existence of a medical malpractice insurance crisis was widely acknowledged when Louisiana's Medical Malpractice Act of 1975 was passed. See 50 Tulane Law Review 655 (1976) and Medical Malpractice by Louisell and Williams, vol. 2, § 20.07 (1990). It is undisputed that the severable provisions of the Louisiana Act were a legislative response to the perceived "crisis". Everett. The Medical Malpractice Act does not affect fundamental rights. Everett.
The statutory cap on medical malpractice judgments in excess of $500,000 distinguishes between classes of persons according to their physical condition. One group, those with injuries evaluated below $500,000, are fully compensated. The other group of malpractice victims, those with damages above $500,000, are fully compensated only for their medical expenses and related benefits. The question is whether that discrimination is arbitrary, capricious and unreasonable. Sibley II.
As an offset to the Act's $500,000 limitation, Louisiana now offers those most severely injured by medical malpractice three benefits: (1) greater likelihood that the offending physician or other health care provider has malpractice insurance; (2) greater assurance of collection from a solvent fund; and (3) payment of all medical care and related benefits. Compensation and full medical care for those grossly injured by medical malpractice are legitimate social interests, which are furthered by the malpractice legislation. The discrimination in the Act against those with excessive injuries is accompanied by a quid pro quo: a reasonable alternative remedy has been provided. See Bazley. Since the legislature's statutory solution to the medical malpractice problem furthers the state purpose of compensating victims, it is not constitutionally infirm.
Overall, the Louisiana Medical Malpractice Act represents a reasonable but imperfect balance between the rights of victims and those of health care providers. It does not violate the state or federal constitutions.
*522 For the foregoing reasons, the judgment of the court of appeal is affirmed.
AFFIRMED.
CALOGERO, C.J., and LEMMON, J., dissent and assign reasons.
DENNIS, J., dissents with reasons.
CALOGERO, Chief Justice, dissenting.
This case presents the need, for the first time, for this Court to determine whether Louisiana's $500,000 cap on damages in a medical malpractice suit violates Art. I, Sec. 3 of the 1974 Louisiana Constitution. That provision bars unreasonable discrimination against any person because of, among other characteristics, physical condition. Only the medical patient most egregiously injured and disabled suffers the indignity and injustice of having limited in court the damages which the law affords all other medical negligence victims. This statutory limit on recovery is blatant discrimination which cannot survive the close scrutiny which our law requires. Defenders of the statute have not on this record convinced me that this discriminatory treatment of the most disadvantaged victims of medical negligence should alone, properly and necessarily, bear the brunt of an asserted "crisis" in the medical industry. In my opinion this discrimination is arbitrary, capricious and unreasonable and does not substantially further a state purpose shown to be both appropriate and based on a convincing reality.
For Louisiana constitutional reasons I would join the other states which have declared unconstitutional similar medical malpractice cap statutes. See Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399 (1976); Carson v. Maurer, 120 N.H. 925, 424 A.2d 825 (1980); Arneson v. Olson, 270 N.W.2d 125 (N.D.1978); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991); Morris v. Savoy, 61 Ohio St.3d 684, 576 N.E.2d 765 (1991); Lucas v. United States, 757 S.W.2d 687 (Tex.1988); Wright v. Central Du Page Hosp. Ass'n, 63 Ill.2d 313, 347 N.E.2d 736 (1976); Kansas Malpractice Victims v. Bell, 243 Kan. 333, 757 P.2d 251 (1988).
LEMMON, Justice, dissenting.
As I stated in dissent on the original hearing in Sibley v. Board of Supervisors of Louisiana State University, 462 So.2d 149 (La. 1985), the $500,000 limitation on recovery violates the equal protection of the laws constitutionally guaranteed to the most severely injured medical malpractice victims.[1]
This court has previously validated other sections of the Medical Malpractice Act of 1975. In Everett v. Goldman, 359 So.2d 1256 (La.1978) this court upheld the constitutionality of the requirement of initial submission of claims to medical review panels. In Crier v. Whitecloud, 496 So.2d 305 (La. 1986), this court upheld the constitutionality of the three-year peremptive period on medical malpractice actions. Each section of the Act, however, may be subject to different constitutional challenges. Both the Everett and Crier decisions involved categories distinguishing medical malpractice victims from other tort victims generally.[2] But neither Everett nor Crier involved *523 a category distinguishing between members of a narrow category of tort victims (those injured by medical malpractice) on the basis of physical condition.
Limiting the recovery of a few catastrophically injured medical malpractice victims, while allowing full recovery to the many lesser injured victims of the same tort, did not substantially further any appropriate state interest in dealing with a perceived or actual medical malpractice insurance crisis in 1975. Therefore, the legislative classification, discriminating on the basis of physical condition against a small category of tort victims, violated the equal protection of the laws guaranteed by the Louisiana Constitution.
Benefit to the public may be a rational basis for a discriminatory classification, but the more speculative and remote the benefit, the more arbitrary, is the discrimination. There was no evidence in this record of empirical data in 1975 which even suggested that awards in excess of $500,000 contributed in any way to high costs or low availability of health care. Research of appellate decisions reported in the ten-year period between January 1, 1973 and December 31, 1982 (the period during which malpractice actions arising in 1975 and in the immediately preceeding years might be expected to reach the appellate courts) reveals no cases in which damages in a medical malpractice case had exceeded $500,000. Although other cases were probably compromised, the total absence of reported appellate decisions in the time frame pertinent to the enactment of the cap in 1975 indicates that awards exceeding $500,000 were not such a problem in 1975 that limiting such awards was a rational means of lowering health care costs.[3] Any advantage that might reasonably have been expected in 1975 to inure to the public in reduced health care costs and increased health care availability from the denial of full recovery to a small group of malpractice victims was extremely speculative, especially when considered in comparison to the enormous deprivation of the rights of the victims.
DENNIS, Justice, dissenting.
I respectfully dissent. A rehearing should be granted, if not to reverse the majority's decision, at least to control the damage to the law done by its opinion.
The majority opinion pays lip service to Art. I § 3 of our constitution and this court's interpretation of it in Sibley v. Board of Supervisors, 477 So.2d 1094 (La. 1985), but quickly degenerates into a hodge podge of ideas incongruous with those principles. For example, "fundamental right" and "rational relationship" are theorems borrowed from the federal three tiered system of equal protection scrutiny, which this court soundly rejected in Sibley, and "societal quid pro quo" is a specious notion emphatically cast-off by courts properly applying the "quid pro quo" or "reasonable just substitute" approach. The majority's reasoning is further flawed by its ambiguous language which suggests that the medical malpractice statute allows a severely injured victim to obtain reparation in the form of a money judgment for "all medical care and related benefits." In fact, the statute disallows a money judgment in excess of the $500,000 ceiling for any element of damage. A victim is relegated to a quasi-administrative proceeding in order to collect, on a claims-made basis, medical expenses and related benefits in excess of the ceiling. Even then, the victim may be subjected to medical exams and denied his claim by the patients compensation fund. Because of its confused analysis, the majority mistakenly based its entire decision on an illusory quid pro quo and never examined the evidence to see whether the proponents carried their burden of proof as required by the intermediate scrutiny standard adopted by Sibley. For the same reason, my colleagues overlooked or disregarded recent government and foundation studies indicating that medical malpractice damage caps and other medical tort reforms *524 have failed to curb insurance costs or to further other legislative objectives.
The damage cap should have been declared unconstitutional under either of the two approaches to which the majority avowed allegiance in words but not in practice. Under a correct application of the heightened equal protection scrutiny standard adopted by this court in Sibley, the proponents of the damage cap failed to carry their burden of proving that the cap measurably furthers the asserted state purpose of restraining insurance costs and fostering medical care. Under the quid pro quo or reasonable just substitute analysis, the most severely injured malpractice victims have been required to give up their right to reparation in the form of a money judgment for more than $500,000, without receiving any reasonable substitute therefor, and without any countervailing sacrifice by health care provider defendants or less severely damaged victims.
Because the majority opinion has no clear or consistent rationale and affords no reliable basis for predicting future decisions, it should be clarified even if the result is not changed. As it stands, the opinion confuses our state constitutional law and threatens to nullify the express guarantees of heightened equal protection for handicapped persons, women, illegitimate children, cultural groups such as Acadians, and other classes which our state constitution seeks to afford enhanced protection from governmental discrimination. Furthermore, the majority opinion could have far reaching harmful effects on our tort law in general, for my colleagues have set us on a course toward sweeping indiscriminate approval of all other statutory damage caps and immunity laws.
Article I, Section 3 of the 1974 Louisiana Constitution, the Declaration of Right to Individual Dignity, provides: "No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."
In Sibley v. Board of Supervisors, 477 So.2d 1094 (La.1985) this court held that under Article I, Section 3: "(1) the federal multilevel system is not an appropriate model for interpreting and applying the protection of equal laws pledged by our state constitution; (2) when a law classifying individuals on the basis of physical condition is attacked, the proponent of the legislation must show that the law does not arbitrarily, capriciously, or unreasonably discriminate against the disadvantaged class by demonstrating that the legislative classification substantially furthers a legitimate state objective." Id. at 1104.
Under this standard, when scrutinizing a law classifying individuals on the basis of physical condition, the court must initially determine if there is a legitimate legislative purpose that could be served by the challenged classification. If such a legitimate objective is lacking, the law fails and further inquiry is unnecessary. If a legitimate government interest can be postulated, the court must then engage in a further analysis to determine whether the classification operates in a constitutional manner. This process involves examination of the legislative means, as well as the postulated ends of the statute to which the means are directed. Furthermore, this standard requires that the state or the proponent of the legislation bear the burden of showing with factual data that the classification substantially furthers the postulated goal of the legislation. See Nowak & Rotunda, Treatise on Constitutional Law, Substance and Procedure, Second Edition § 8.3 (1992).
In Sibley, this court also held that the medical malpractice act discriminates between two classifications of malpractice victims based on their physical condition, viz., (1) victims whose judgments under general tort law would exceed $500,000 because of the catastrophic nature of their disabilities and injuries, but whose money judgments are limited to this amount by the act; and (2) all other victims, who are *525 permitted full reparation under general delictual law for their less severe disabilities and injuries by money judgments. Sibley, 477 So.2d at 1104. This court in Sibley remanded the case to allow the proponents of the classification to attempt to overcome the presumption of its unconstitutionality, but did not engage in a discussion of all of the aspects and ramifications of the statute in detail. In the present case, the majority acknowledges the discriminatory classifications based on physical condition but suggests, perhaps, that the harsh effects of the classification are softened because the statute does not impose a ceiling or cap on damages related to medical expenses and related benefits. Unfortunately, the words of the statute do not seem to support this humane view, and my colleagues do not make it absolutely clear that they will adhere to it as their own.
As I read the medical malpractice act, it absolutely bars a victim from obtaining a final or definitive judgment for the payment of money in excess of $500,000 against qualified health care providers and the patients' compensation fund. Although the act establishes a quasi-administrative procedure for the payment of medical expenses and related benefits in excess of this amount, the victim must submit periodic claims, apparently for expenses actually incurred, for the patients' compensation fund's approval or disapproval, and may be compelled to submit to medical examination from time to time.
In malpractice actions covered by the act, the trier of fact must make a finding or "recitation that the patient is or is not in need of future medical care and related benefits and the amount thereof." La.R.S. 40:1299.43 A(1) & (2). If the total amount that the victim would be entitled to recover under general tort law exceeds the ceiling of $500,000, exclusive of the value of future medical care and related benefits, the cost of all future medical care and related benefits shall be paid in accordance with the quasi-administrative procedure. Id. subpar. (3). Under this procedure, once a judgment is entered in favor of a patient found to be in need of future medical care or related benefits "and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the patients compensation fund through the office of the attorney general for all future medical care and related benefits...." Id. (B)(2). The trial court has continuing jurisdiction of the case. Id. (E)(1). The patients compensation fund may have the patient examined by a physician of its choice from time to time "for the purpose of determining the patient's continued need of future medical care and related benefits". Id. (G)
When the Article I, Section 3 standard is correctly applied in the present case, it is clear that while the defendants may have advanced hypothetically a legitimate statutory purpose for the cap, they manifestly have failed to carry their burden of proving that the $500,000 limitation of damages substantially furthers this purpose in reality. The legitimate objective they postulated is twofold: (1) to reduce or stabilize medical malpractice insurance rates and (2) to assure the availability of affordable medical services to the public. On the record presented for our review, however, the proponents of the damage cap simply have not shown that it has caused insurance rates to be either reduced or stabilized or that a removal of the cap would cause rates to increase. Similarly, they have failed to prove with factual data that the cap has affected the availability of affordable medical services or that its absence would do so adversely in the future. "Physical condition" was included in the specific categories afforded heightened scrutiny and protection under Article I, Section 3 in order to prevent a legislative classification disadvantaging handicapped, crippled and catastrophically injured persons unless the champions of the classification proved that it substantially furthers a legitimate state purpose. Sibley, 477 So.2d at 1109. Because the proponents of the $500,000 cap have failed to prove that it is so justified it should be declared unconstitutional.
Like a ship in the night, with only a look and a nod in passing, the majority barely acknowledges Article I, Section 3 of our state constitution and this court's interpretation *526 of it in Sibley while pursuing a hithertofore uncharted course. Indeed, if my colleagues meant to follow our previous interpretation of state constitutional law, as their citations indicate, they certainly fouled up their navigation. First, they repeatedly declare that the right involved here is not "fundamental" despite the fact that this classification is foreign to our state right of individual dignity. Article I, Section 3 commands the courts to decline enforcement of a legislative classification of individuals in three different situations: (1) when the law classifies individuals by race or religious beliefs, it must be repudiated absolutely; (2) when the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification substantially furthers a legitimate purpose; and (3) when the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate purpose. Sibley, 477 So.2d at 1107. Second, the majority fails to notice that the burden of proving that a classification based on physical condition is on its proponent, not upon the individual discriminated against, because that classification is presumed to be invalid until shown otherwise. Third, they indiscriminately cite and rely on cases that have nothing to do with classifications based on physical condition or Article I, Section 3, such as Everett v. Goldman and Bazley v. Tortorich. Fourth, because of their confusion on the foregoing points, my colleagues in the majority fail to even identify the state purpose which the proponents must prove is furthered by the classification, i.e., improved insurance rates and medical services, or bother to analyze the evidence to see if the proponents of the discrimination carried their burden.
As a result, the majority unintentionally winds up applying a standard very similar to the federal "minimal scrutiny" or "rational relationship" test that the delegates and the electorate sought to replace with Article I, Section 3 of our state constitution. Under that federal test, statutory classifications will not be declared invalid "if any state of facts reasonably may be conceived to justify [them]". McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Also, the court using minimal scrutiny is to give the greatest amount of deference to the legislature, as the constitutionality of the provision is presumed. The burden of proof rests on the individual to show that no rational basis exists. Note, Equal Protection and Medical Malpractice Damage Caps, 28 Idaho L.Rev. 396, 404 (1991-92). To some scholars, this analysis is really a predetermined ruling and "minimal" is really no scrutiny at all:
For example, it would be `rational' in this sense to burn down a barn to kill a rat. Further, courts will not allow an empirically based challenge to undo a legislative classification. Even if dubious on empirical grounds, the legislation will be sustained if the legislative judgment was logically plausible. It is therefore unsurprising that nearly all legislative classifications have been sustained when courts apply this standard." Bovbjerg, Sloan and Blumstein, Valuing Life and Limb in Tort: Scheduling `Pain and Suffering.'" 83 Nw.L.Rev. 908, 970 (1989) (Footnotes omitted).
The test for classifications based on physical condition, birth, sex, culture, inter alia, under Article I, Section 3 was intended to be more like the United States Supreme Court's "intermediate scrutiny" that falls between "strict scrutiny" and "minimal scrutiny" and requires that the classification be "substantially related to a legitimate state interest." See Mills v. Habluetzel, 456 U.S. 91, 99, 102 S.Ct. 1549, 1554, 71 L.Ed.2d 770 (1982). Although the Supreme Court thus far has reserved this test mostly for cases involving gender discrimination, Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), or classifications based on illegitimacy, Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), Article I, Section 3 expands these "quasi-suspect classifications" to include those based on physical condition, age, culture, *527 political ideas, or affiliations. The majority, in the present case at least, reads the classifications earmarked for heightened or "intermediate scrutiny" out of Article I, Section 3 of the Louisiana Constitution, despite the clear intention of the delegates and the people to write in enhanced protections and elevated examination of such classifications for women, handicapped persons, culture groups, illegitimates and other persons who might suffer discriminations by unjustifiable classifications.
The majority opinion overlooks or disregards several empirical studies done in states other than Louisiana indicating that medical malpractice damage caps, either singly or in connection with other tort law modifications, have not had their intended effects upon malpractice insurance premiums or the availability of affordable medical services. General Accounting Office, Medical Malpractice: Six State Case Study Shows Claims and Insurance Costs Still Rise Despite Reforms, HRD-87-21 (December 1986); Danzon, The Effects of Tort Reforms on the Frequency and Severity of Medical Malpractice Claims, 48 Ohio State L.J. 413 (1987); Sloan, State Responses to the Medical Malpractice Insurance "Crisis" of the 1970's": An Empirical Assessment, 9 J. Health Politics, Policy, and Law 629 (1985); Zwier and Pirmattei, Who Knows Best About Damages: A Case for Courts' Rights, 93 Dick.L.Rev. 689 (1989) Even in Indiana, the state with the most stringent medical malpractice reforms and some of the lowest medical malpractice premiums, the effects of the cap itself have been found to be counterintuitive, and perhaps counterproductive. Indiana is the only state that has had a cap on all damages, including economic loss as well as pain and suffering, in place consistently since 1975. Yet its cap in actual practice operates as a floor instead of a ceiling, encouraging large claims to "bump" up against the cap, increasing rather than depressing average claim severity and paid out damages, and causing concerns about actuarial soundness, slow payment of claims, and other problems. Gronfein and Kinney, Controlling Large Malpractice Claims: The Unexpected Impact of Damage Caps, 16 J. of Health, Politics, Policy and Law, 441 (Fall 1991); Bovbjerg, Lessons for Tort Reform from Indiana, Id. at 465. The long range effectiveness of the Indiana cap, therefore, appears to be in doubt. In effect, it creates a strict liability system which encourages and inflates most claims while exacerbating the harshness of its discrimination against the relatively few catastrophically disabled and injured victims.
In recent well-reasoned state equal protection decisions, other state courts have applied heightened scrutiny and concluded that damage caps were invalid under their state constitutions. In the present case, the majority missed the significance of this trend because it simply lumped together citations of state decisions of all kindsnot just equal protection caseswithout any real analysis. Even when not specifically required by their state charters, many state courts have applied intermediate scrutiny in reaching their decisions. As the Alabama Supreme Court observed in Moore v. Mobile Infirmary Association, 592 So.2d 156, 170 (Ala.1991), "[s]tate courts, in determining the scope of rights guaranteed by their own constitutions, are not compelled exactly to correlate their standards of review to the `three-tiered' scrutiny employed by the federal courts and may, in fact, provide more protection for private rights than the United States Constitution requires." Accordingly, the Alabama court applied its own form of elevated standard of review and concluded:
[T]he damages cap imposed ... and the reduction of health care costs to the citizens of Alabama is, at best, indirect and remote. Although there is evidence of a connection between damages caps and the size of malpractice claims filed, the size of claims is merely one among a host of factors bearing on the cost of malpractice insurance. Even more significantly, the cost of malpractice insurance ranks near the bottom of the list of expenses incurred by health care providers. Consequently, the size of claims against health care providers represents but one among many elements composing the *528 cost of malpractice premiums, which, in turn, represent only a small component of the total burden borne by health care consumers.
By contrast, the burden imposed ... on the rights of individuals to receive compensation for serious injuries is direct and concrete. The hardship falls most heavily on those who are most severely maltreated and, thus, most deserving of relief. Unlike the less severely injured, who receive full and just compensation, the catastrophically injured victim of medical malpractice is denied any expectation of compensation beyond the statutory limit. Moreover, the statute operates to the advantage not only of negligent health care providers over other tortfeasors, but of those health care providers who are most irresponsible. Id. at 169 (citations omitted).
See also, Carson v. Maurer, 120 N.H. 925, 424 A.2d 825, 831, 836-37 (1980) ("[T]he test is whether the challenged classifications are reasonable and have a fair and substantial relation to the object of the legislation. (citations omitted). Whether the malpractice statute can be justified as a reasonable measure in furtherance of the public interest depends upon whether the restriction of private rights sought to be imposed is not so serious that it outweighs the benefits sought to be conferred upon the general public. * * * It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation."); Arneson v. Olson, 270 N.W.2d 125 (N.D.1978); Brannigan v. Usitalo, 134 N.H. 50, 587 A.2d 1232 (1991); McGuffey v. Hall 557 S.W.2d 401 (Ky. 1977).
The present case demonstrates clearly the impracticality of either the strict scrutiny or the rational relationship test. That is why an intermediate test of equal protection was established by Article I, Section 3 of our state constitution for the judicial review of statutory classifications based on physical condition and other quasi-suspect categories, as this court recognized in Sibley v. Board of Supervisors, 477 So.2d 1094 (La.1985) (on rehearing). My colleagues acknowledge the heightened protection of the constitution against arbitrary discrimination through use of such classifications, and they cite Sibley with approval, even mouthing some of its words. But in the final analysis they quail and turn away, reverting to a rational relationship test, without seeing any need to offer an explanation for their crucial deviation. All of this suggests that they may have acted irresolutely because of a lack of full understanding of the significant differences between the various equal protection tests and should be willing to reconsider this case in light of the proper test and the appropriate type of scrutiny.
A rehearing is also warranted because my colleagues have not fully understood the implications that this decision may have on our scrutiny of other statutory limitations of damages and grants of immunity. Other vested interests will be encouraged to seek special legislation granting them similar limitations of liability or damages if rational relationship is to be the only equal protection test applied. The legislature may feel free to enact damage caps routinely if the present case means that this court will apply only minimal scrutiny in reviewing every limitation of damage statute. Busy trial courts may be loath to undertake the arduous task of requiring proof that damage caps substantially further a legitimate state objective because this court today creates serious doubt that the constitution so requires. Moreover, the trial and appellate courts may interpret the majority's opinion as blanket approval of any damage cap law which the legislature attempts to justify with a plausible rote of crisis, such as La.R.S. 13:5106 purporting to cover the state, state agencies and political subdivisions with a $500,000 damage cap. See also the proliferous body of immunity, no duty and limitation of liability statutes covering everything from Mardi Gras parades to block safe houses, which may be affected by the present decision. La.R.S. 9:2791-2800.8. Ultimately, from the present decision, we may reap constitutional interpretations and a floodtide of *529 damage cap legislation that will cause massive incursions into our general tort law and ultimately divide all potential defendants into the "haves" and the "have nots", i.e. the state, state agencies, state subdivisions, and the special interest groups, with the benefit of cap protection, on the one hand, and the average citizens, without benefit of caps and obliged to pay all of their just debts, on the other.
The majority's attempt to perform a "quid pro quo" or "reasonably just substitute" analysis is almost as disappointing as its distortion of heightened or intermediate scrutiny into a mere rational relationship test. Some state courts have applied a quid pro quo analysis to conclude that a medical malpractice damage cap is unconstitutional as violative of the victim's state constitutional right to access to courts. E.g., Smith v. Department of Insurance, 507 So.2d 1080, 1088 (Fla.1987) ("`[W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State ... the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be found.'") See also, Lucas v. United States, 757 S.W.2d 687 (Tex. 1988); Arneson v. Olson, 270 N.W.2d 125 (N.D.1978); Wright v. Central Du Page Hosp. Assn., 63 Ill.2d 313, 347 N.E.2d 736 (1976). One scholar has suggested that the quid pro quo analysis, similar to that used in worker's compensation and nuclear accident compensation schemes, also should be applied as a part of or instead of intermediate scrutiny to require that medical malpractice compensation statutes provide a "reasonably just substitute" for a patient's abridged common-law remedies. Learner, Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis To Safeguard Individual Liberties, 18 Harv.J. on Legislation 143 (1981). Although the United States Supreme Court has not expressly required that a reasonably just substitute be present in a statute abrogating or limiting commonlaw remedies, the Court's discussions in worker's compensation and nuclear accident compensation cases have strongly endorsed substitute statutory benefits. Duke Power v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); New York Central Railroad Co. v. White, 243 U.S. 188, 201, 37 S.Ct. 247, 252, 61 L.Ed. 667 (1917) The rationales of these cases logically dictate that this quid pro quo should be present even to satisfy the minimum rationality standard of review. Because the semi-suspect class and quasi-fundamental rights threatened by medical malpractice compensation schemes support a stricter review standard, the policy arguments supporting inclusion of a reasonably just substitute are especially applicable. Learner, supra at 200.
This is very similar to the view expressed by Chief Justice Dixon in his dissenting opinion in Williams v. Kushner, 549 So.2d 294, 304-312 (La.1989). He interpreted Article I, § 22 of our state constitution to require, in effect, that a reasonably just substitute be present in any legislative act diminishing or abolishing for a "discrete category of tort victims" a remedy provided by general law. Id. at 310. Article I, § 22 provides:
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights. (emphasis added)
Chief Justice Dixon maintained that the meaning of the guarantee that "every person shall have an adequate remedy" is based on "the accumulated human and legal experience expressed in our Civil Code... [which] would not restrict the legislature's authority to define the nature of relief to be granted when a legally cognizable harm has occurred. But where a cause *530 of action has been recognized in the law, the measure of the remedy provided, in whatever form, must meet the constitutional mandate of adequacy." Id. at 311. When the "adequate remedy" guarantee is considered in reference to other constitutional provisions this interpretation is compelling. If a majoritarian legislative body were free to abrogate or diminish for minorities or particular individuals the rights and remedies provided for the majority by general law, without at least providing a reasonably just substitute, there could be no constitutional democracy under which government "is instituted to protect the rights of the individual," Art. I, § 1, La. Const. 1974, including the right to substantive due process of law, Id. Art. I, § 2, freedom from indignity and involuntary servitude, id. § 3, and other unenumerated rights retained by the individual citizens of the state. Id. § 24. See also, id. Preamble.
The worker's compensation and nuclear compensation schemes indicate the essential elements of a constitutionally acceptable reasonably just substitute when an established remedy under general law is abrogated or substantially diminished for a particular class of citizens. Countervailing sacrifices are demanded from each party. In exchange for the limitations on the accident victim's remedy, a strict liability system guarantees a recovery by superseding the plaintiff's prior obligation to prove negligent conduct. A relatively simplified claims procedure significantly benefits the plaintiff by providing a prompt and efficient mechanism for damage recovery, thereby obviating for all parties the costs and long delays of ordinary negligence litigation. See Learner, supra at 202.
For example, the worker's compensation acts provided a quid pro quo in that the employer assumed a new liability without fault but was relieved of the prospect of large damage judgments, while the employee, whose monetary recovery was limited, was awarded compensation without regard to the employer's negligence. In other words, the employer was required to give up certain defenses and the employee was required to give up certain recoverable elements of damage of an ordinary negligence action. See Wright v. Central DuPage Hosp. Assn., 63 Ill.2d 313, 347 N.E.2d 736, 742 (1976).
In the Louisiana Medical Malpractice Act, however, the legislature placed a drastic limitation on the severely injured patient's ability to seek full reparation for his damage under general delictual law without requiring countervailing sacrifices by other parties. The act abolished no delictual defenses, nor did it reduce in number or difficulty the essential elements the plaintiff must establish to recover for medical malpractice or lessen the plaintiff's evidentiary burden of proof. Nor was any reasonably just substitute or adequate remedy supplied in place of the recoverable elements of damage that the medically wrecked person is required to give up. In practice, the claims system has not been made simpler, speedier or less expensive. Meritorious claims are not handled more efficiently or paid more promptly. Nor does it appear that the damage cap or the system of which it is a part provide any greater deterrence to medical negligence or nonmeritorious claims. The elements of reciprocity traditionally associated with a valid quid pro quo or reasonably just substitute appear to be totally absent.
The majority erroneously assumes that a reasonably just substitute for the abrogation of victims' remedies for extra-cap damages has been provided by (1) the absence of a cap on medical expenses and related benefits; (2) an incentive for each physician to maintain $100,000 of malpractice insurance; (3) a solvent fund to cover an additional $400,000 of a physician's liability.
The majority is clearly incorrect in its apparent assumption that there is no ceiling or limitation on money judgments for future medical expenses or related benefits. The statute unquestionably bars a money judgment in excess of $500,000 for any element of damage, including medical expenses and related benefits. The victim is relegated to a quasi-administrative claims remedy and is subject to examination, evaluation and claim rejection at any time. If the victim's future medical expense claims are not subject to an "airtight" *531 "cap", they nevertheless must pass through a "damper" under the control of the trial court and the patients compensation fund. Even if the majority's assumption is correct, its contention that the statute's failure to cap medical expenses and related benefits constitutes a quid pro quo for the abridgement of victim's rights is illogical. The lack of a cap on medical expenses and related benefits provides a plaintiff with no new benefit and in no way makes up for the limitation imposed on all of his other damages. Therefore, the first "benefit" is nothing more than an illusion.
The next two "benefits" are specious. First, there is no proof in the record that the damage cap either stimulates the purchase of insurance or measurably improves the solvency of defendants. Second, even if it were assumed that these effects flow generally from the damage cap, there is no proof that they help make up for its harsh effects upon severely injured "capped" victims in particular. These presumed benefits extend to the public and all medical malpractice claimants, whereas only the few catastrophically injured malpractice victims are forced to bear the cost of a ceiling on their right to reparation in the form of a money judgment. The alleged benefits relative to such victims' extreme burdens are so disproportionate as to be virtually irrelevant. Third, the legitimate ends of promoting insurance and solvency can be furthered more effectively through other means without such harsh, discriminatory effects upon the most severely injured of all medical malpractice victims. Indeed, the "benefits" cited by the majority resemble those involved in the concept of a "societal quid pro quo" which has been emphatically rejected as providing no just recompense for the abridgement of individual plaintiffs' remedies. See Wright v. Central Du Page Hospital Assn., supra, 347 N.E.2d at 742; Learner, supra 205.
Finally, because of my colleagues' overestimation of the remedy afforded by the act for a victim's future medical expenses and related benefits, the majority tends to minimize the harshness of the damage cap's effect on a victim because of his restricted reparation for "noneconomic" damage. "Noneconomic", "moral", "nonpecuniary" and "extra-patrimonial" damages include humiliation, embarrassment, pain and suffering, shock, loss of enjoyment and companionship, fear, anxiety, indignity, loss of consortium and grief. See Stone, Tort Doctrine § 14, and authorities cited therein. For many plaintiffs, a limitation upon those kinds of damages alone can have extremely harsh effects. For a child such as Michelle Butler, who from the age of three has suffered from cardiac arrest, blindness, paralysis and retardation, the only compensation for a lifetime without play, colors, visual arts, reading, and higher education comes from noneconomic damages. Similarly, a person who has been hideously disfigured receives only noneconomic damages to ameliorate the resulting humiliation and embarrassment. As with all plaintiffs, noneconomic damages provide the malpractice victim with the primary source of compensation for loss of physical capacity or reduced life expectancy.
Relatively few medical malpractice victims will be entitled to awards of $500,000 or more exclusive of medical expenses and related benefits. But the limitation upon damages in such cases tends to be harsh indeed. Most such recoveries occur in cases involving permanent, catastrophic damage to children, as in the present case and Williams v. Kushner, and to young, previously health adults. See Sibley v. Board of Supervisors. When the limited recovery is spread out over the lifetime of a young person, it shrinks in comparison with the cumulative damage that the severely injured and disabled patient must suffer and endure until his or her death.
As in Roberts v. Benoit, 603 So.2d 150 (La.1992), a majority of this court has been blinded by a dazzling array of legal talent assembled by special interest groups opposing the single catastrophically injured and disabled tort victim. Unfortunately, whereas in Roberts the parties seeking special advantages to the detriment of the public succeeded only in causing limited damage to one area of tort law, in the present case the interest groups may have caused the court to do far-reaching harm to *532 our state constitutional law as well as to many areas of our tort law in addition to medical malpractice. In order to prevent or minimize this damage, a rehearing should be granted.
NOTES
[1] The majority erroneously refers to the limitation as a "cap on general damages." La.Rev. Stat. 40:1299.42B limits a medical malpractice victim's total recovery to $500,000, exclusive of the cost of future medical care and related benefits. Perhaps a statutory cap that excluded lost wages and damages for impaired earning capacity from the cap (as well as all medical costs) might more reasonably be deemed to significantly further an appropriate governmental interest. But as an example of a draconian result under the present law, a widower with several young children who earned $125,000 a year before being totally disabled by medical malpractice would suffer a loss of wages which exhausts the limits of his recovery by the time of trial four years after the tort and would receive no general damages whatsoever (not to mention the total denial of any replacement wages for the rest of his work life expectancy.)
[2] The Everett categories were validated on the basis of the need for a means of culling out frivolous cases because of the enormous cost of this type of litigation. The Crier decision approved a peremptive period, which overrode the discovery rule available in other tort cases, on the basis of the particular need in this type of case for limiting the "long tail" of liability caused by the discovery rule and the resulting impact on medical malpractice liability insurance and the cost and availability of health care.
[3] After the Medical Malpractice Act was adopted in 1975, the first certiorari application (a few months before the application in Sibley) involving the cap was in Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000 (La.App. 1st Cir.), cert. denied, 434 So.2d 1093 (La.1983).