# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


## 09-439


**JOE OLIVER, ET AL.**

**VERSUS**

**MAGNOLIA CLINIC, ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2005-3709
HONORABLE CLAYTON DAVIS, PRESIDING
**\*\*\*\*\*\*\*\*\*\***

## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, Oswald A. Decuir, Jimmie C. Peters, Marc T. Amy, Elizabeth A. Pickett, Billy H. Ezell, J. David Painter, James T. Genovese, Shannon J. Gremillion and Phyllis M. Keaty, Judges.

**AFFIRMED IN PART; REVERSED IN PART; EXCEPTION OF RES JUDICATA DENIED.**

**Saunders, J., concurs in the result and assigns written reasons.**

**Painter, J., concurs in the result for the reasons assigned by Saunders, J.**

**Amy, J., dissents and assigns written reasons.**

**Gremillion, J., dissents for the reasons assigned by Amy, J. and also assigns additional reasons.**

**Decuir, J., dissents for reasons assigned by Amy, J. And Gremillion, J.**


Todd A. Townsley
Marcus P. LaCombe
The Townsley Law Firm, L.L.P.
3102 Enterprise Blvd.
Lake Charles, LA 70601
(337) 478-1400
COUNSEL FOR PLAINTIFFS/APPELLANTS:
      Joe and Helena Oliver, individually and on behalf of their minor child,
      Taylor Oliver

Richard B. Cappe1
Raggio, Cappel, Chozen & Berniard
P.O. Box 820
Lake Charles, LA 70602
(337) 436-9481
COUNSEL FOR DEFENDANTS/APPELLEES:
    Susan Duhon d/b/a the Magnolia Clinic and St. Paul Marine Ins. Co.

John Elliott Baker
321 N. Vermont Street #208
Covington, LA 70433
(985) 867-9068
COUNSEL FOR INTERVENOR/APPELLEE:
    State of Louisiana

Nadia Marie de la Houssaye
Jones, Walker, Weechter, Poitevant, Carriere & Denegre, L.L.P.
P.O. Drawer 3408
Lafayette, LA 70502-3408
(337) 262-9000
COUNSEL FOR INTERVENOR/APPELLANT:
    Louisiana Patient's Compensation Fund

Guice Anthony Giambrone, III
Kelly A. Dugas
Blue Williams, L.L.P.
3421 N. Causeway, Suite 900
Metairie, LA 70002
(504) 891-4091
AMICUS CURIAE:
    Louisiana Association of Nurse Practitioners

**COOKS, Judge.**

This matter is on remand from the Louisiana Supreme Court for *en banc* consideration the majority of judges voted with instruction that we render a decree "reflecting a majority vote on each of the issues presented." *Oliver v. Magnolia Clinic*, 10-2766, 10-2782,10-2785 (La. 3/25/11), 57 So.3d 307. After *en banc* consideration, a majority of the judges voted to adopt the original opinion released in this case with additional reasons as follows.

Joe and Helena Oliver (Plaintiffs), individually and on behalf of their minor child, Taylor Oliver, appeal the trial court's judgment applying the Louisiana Medical Malpractice Act's cap, reducing a jury's $6,233,000.00 general damage award in their favor to the cap of $500,000.00 and denying their petition seeking to have the Medical Malpractice Act's (MMA) limitation, La.R.S. 40:1299.42(B), as applied to their claims, declared unconstitutional. The Louisiana Patient's Compensation Fund (PCF) also appeals the judgment and alleges the trial court committed error in awarding the Olivers past medical expenses and judicial interest on these expenses. Susan Duhon, the nurse practitioner whom the Medical Review Panel and jury found committed malpractice, filed a peremptory exception of *res judicata*, challenging the Olivers' right to appeal the trial court's judgment reducing the jury's general damage award because, as she alleges, the Olivers only appealed the denial of the declaratory judgment and not the judgment on the underlying tort claim.

We reject the positions of the PCF and Nurse Duhon and find, as the supreme court similarly held in *Sibley v. Board of Supervisors of Louisiana State University*, 477 So.2d 1094 (La.1985) (commonly referred to as *Sibley II*), that the MMA's cap on general damage awards unconstitutionally disadvantages and discriminates against Taylor and her parents, victims of nurse Duhon's malpractice, because of the severity

-1-

of Taylor's physical condition when compared to other malpractice victims who receive full recovery for their injuries. We find the State failed to present sufficient evidence to show that any reasonable basis exists today to continue such discrimination by expanding the MMA's limitation on general tort liability to include nurse practitioners, some of whom are "grandfathered" from having to complete the academic studies and degree requirements found in La.R.S. 37:913(3)(a) and who choose to own and operate private healthcare clinics in the State of Louisiana. We must declare the MMA's cap, when used to limit this group of healthcare providers' general liability for damages caused to severely or catastrophically injured victims, not only discriminatory as declared in *Sibley II*; but that its application, in these instances, violates the Equal Protection Clause of Article I, Section 3 of the Louisiana Constitution and the right to an adequate remedy guaranteed in Article I, Section 22 of the Louisiana Constitution. We, therefore, are constitutionally mandated in this case to refuse enforcement of the cap to insulate these nurse practitioners from full liability for the harm they cause without a reasonable basis having been advanced by the State or other advocates as explained hereinafter.

## FACTS AND PROCEDURAL HISTORY

Susan Duhon, a registered nurse practitioner, opened the Magnolia Clinic to provide primary care to pediatric patients in southwest Louisiana. In 1974, Ms. Duhon obtained a diploma in nursing from a hospital which later certified her as a pediatric nurse practitioner in 1977. Currently, to qualify as a nurse practitioner, a nurse is required to obtain a baccalaureate of science and a masters of science in nursing. La.R.S. 37:913(3)(a). Although Ms. Duhon did not obtain any degree in nursing from an institution of higher learning, she was allowed to escape the more rigorous requirements enacted by statute with only a high school degree, under the

"grandfathered" exception.

Ms. Duhon became a qualified health care provider for purposes of the MMA by purchasing the requisite malpractice insurance coverage from St. Paul Fire and Marine Insurance Company.[1] Nurse practitioners are required by La.R.S. 37:913 to collaborate with a physician. Dr. Jennette Bergstedt, M.D., was the physician Ms. Duhon selected and agreed to collaborate with when providing primary care from the Magnolia Clinic, which she operated as sole owner. Louisiana Revised Statutes 40:1299.41(A)(10) also provides that "hospitals" are qualified healthcare providers under the MMA. Louisiana Revised Statutes 40:1299.41(A)(11) defines "hospital" to include any "clinics containing facilities for the examination, diagnosis, treatment or care of human illnesses." Thus, under the MMA, the Magnolia Clinic is a qualified health care provider.

Taylor Oliver was born on September 5, 2000. Shortly after birth, Taylor began experiencing health problems. Her mother brought her to the Magnolia Clinic, where she was treated exclusively by Ms. Duhon. The record indicates Taylor presented several times per month with various complaints, including: repeat infections, persistent abdominal pain, nausea, vomiting, diarrhea, and anemia. Taylor's mother reported to Ms. Duhon that the child occasionally awakened at night screaming from abdominal pain. During Taylor's first year of life, she was treated at the Magnolia Clinic on thirty-two occasions.

Despite her statutory duty to consult with a physician when needed, Ms. Duhon did not collaborate with Dr. Bergstedt concerning Taylor's condition. Instead, she repeatedly offered only verbal reassurances to Taylor's mother and prescribed over

---

[1]The MMA limits the damages that may be awarded against health care providers who become "qualified" by presenting proof of the purchase of malpractice insurance or who deposit $125,000.00 in cash or other security with the PCF. La.R.S. 40:1299.42.

thirty medications, including antibiotics, to treat the child's multiple complaints and observable symptoms. Taylor's mother testified when she asked to see Dr. Bergstedt, she was told by Ms. Duhon the only time Taylor needed to see Dr. Bergstedt was in connection with admission to a hospital.

On November 7, 2001, after no progress was made in Taylor's health, her mother brought her to Women & Children's Hospital in Lake Charles, where Taylor was treated for the first time by Dr. Bergstedt. Multiple tests were ordered by the doctor, and she referred Taylor to Texas Children's Hospital for specialized care.

Eventually, Taylor's condition was diagnosed as neuroblastoma, a form of childhood cancer originating in the nerve tissue. The scant medical records maintained by the Magnolia Clinic revealed at approximately six months of age, Taylor developed severe bruising around the eyes–one of the telltale signs of childhood neuroblastoma. If neuroblastoma is diagnosed within the first year of life, a child has a ninety percent chance of an *event-free survival*. However, Taylor's opportunity to live a normal life was lost when her condition was not timely diagnosed.

Taylor has survived the cancer, but the quality of her life has been severely diminished. The tumor advanced into her long bone, face, eyes, ears, skull, and spine. Her head is abnormally large and misshapen. Her eyes are abnormally large, bulbous, and opaque with cataracts, rendering her legally blind. Her bones have become weakened and brittle, such that she cannot participate in common youth activities, and she struggles each day to overcome learning disabilities.

The Olivers pursued medical malpractice claims against Ms. Duhon and Dr. Bergstedt. Ultimately, Dr. Bergstedt was dismissed from the suit. The matter was tried before a jury, which returned a verdict against Ms. Duhon in favor of the Olivers,

on Taylor's behalf, for $6,000,000.00 in general damages, $629,728.24 in past medical expenses, and $3,358,828.00 in future medical expenses. The jury awarded Mr. Oliver $33,000.00 for loss of consortium and awarded Ms. Oliver $200,000.00 for loss of consortium.

Attempting to avoid the harsh consequence of the MMA, which limits Taylor and her parents' recoverable general damages to $500,000.00 (one-twelfth of the jury's award), Plaintiffs filed a Petition for Declaratory Relief asserting the MMA is unconstitutional on several grounds. In their petition, they specifically alleged the MMA: (1) establishes an inadequate remedy in violation of Taylor's right under La.Const. art. 1, § 22; (2) precludes any remedy for Mr. and Ms. Oliver, again in violation of La.Const. art. 1, § 22; (3) violates the separation of powers provision of La.Const. art. 5, § 16, in that it constitutes a prejudgment of the compensation award in medical malpractice cases, which is the province of a district court; (4) creates an immunity in favor of health care providers in violation of La.Const. art. 3, § 12(7); and (5) denies equal protection to severely injured patients in violation of La.Const. art. 1, § 3. They prayed that the court declare the cap unconstitutional.

The State of Louisiana and the PCF intervened in the suit to challenge Plaintiffs' attack on the constitutionality of the MMA. The trial court rendered written reasons for judgment after conducting a full *Sibley II* hearing. Initially, the trial court declared the cap constitutional in all respects except its inclusion of nurse practitioners as qualified providers. The trial court found there was no evidence demonstrating that there "was a crisis in the field of nurse practitioners either at the time of the passage of the [MMA] or today." Further, he observed the State offered no evidence to show a need for including nurse practitioners in the class of healthcare providers protected by the MMA. He concluded, while the cap was arguably necessary in 1975 (when the

MMA was adopted) for doctors and hospitals, extension of the MMA to include nurse practitioners does not logically follow without evidence to show "a reasonable basis" exists for limiting their liability.

Ms. Duhon and the State filed a Motion for New Trial/Reconsideration on the Issue of Constitutionality, alleging the trial court erred in declaring "the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41, unconstitutional even though the Plaintiffs had only pled the unconstitutionality of La.R.S. 40:1299.42(B)." They maintained there simply was no allegation that La.R.S. 40:1299.41(A)(1) (the listing of who are qualified healthcare workers) is overly inclusive. Thus, Ms. Duhon and the State argued, since Plaintiffs never pled the unconstitutionality of La.R.S. 40:1299.41(A)(1), any constitutional challenge based on that ground was not properly before the trial court. The trial court agreed, setting forth the following reasons:

> The State's main argument regarding this motion is that Plaintiffs did not properly raise the constitutional issue in the pleadings. A constitutional challenge must be specifically pled. The Plaintiffs never raised the issue of whether the Louisiana Medical Malpractice Act is overly broad due to its inclusion of nurse practitioners cap. As a result, the Plaintiffs' argument fails on its face due to procedural insufficiency.

> The Court agrees with the State that the issue was not pled specifically. As a result the Court GRANTS the Motion for New Trial/Reconsideration on the Issue of Constitutionality and reverses its decision on the issue of constitutionality ruling the Medical Malpractice Act constitutional.

The trial judge then signed a judgment reducing the jury's award to conform with the limitation on general damage recovery and other restrictions of the MMA. The Olivers appealed this judgment, arguing the trial court erred in finding the MMA's limitation on recovery (the cap), La.R.S. 40:1299.42(B), is constitutional as applied to Ms. Duhon and Taylor in this case. Ms. Duhon has raised a peremptory exception of *res judicata*, asserting the Olivers only appealed the declaratory judgment and not the judgment on the verdict in the underlying tort claim. The PCF also assigns

as error the trial court's award of past medical expenses and the award of interest thereon.[2]

## ANALYSIS

### I. Peremptory Exception of Res Judicata.

Ms. Duhon filed a peremptory exception of *res judicata*, alleging that the Olivers did not appeal the judgment entered in the tort claim, but rather only the judgment in their declaratory judgment action. Thus, she argues, the judgment on the jury's verdict is final. We disagree.

The judgment limiting Ms. Duhon's liability to $100,000.00 was rendered on December 30, 2008. The relevant portion of the trial court's judgment read as follows:

> **IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the challenge of the limitation on recovery imposed by the Louisiana Medical Malpractice Act La.R.S. 40:1299.42(B) is constitutional.**
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the amount of damages set forth in the original verdict of June 8, 2007 will be adjusted and reduced to the limitations imposed by the Medical Malpractice Act.**

The trial court then reduced Ms. Duhon's liability as the healthcare provider from $6,000,000.00 to $100,000.00 pursuant to La.R.S. 40:1299.42(B). In their timely appeal, the Olivers listed four separate errors committed by the trial court, all of which clearly maintain that the MMA's limitation on their recovery is unconstitutional. Ms. Duhon contends in her exception that the Olivers appealed "only" the judgment associated with the Declaratory Judgment action. The Olivers note there are no other final judgments in this matter, other than the judgment reducing Ms. Duhon's liability from $6,000,000.00 to $100,000.00 based on La.R.S. 40:1299.42(B). We also note the Uniform Rules–Courts of Appeal, Rule 2-12.4 requires that an appellant attach a

_____

[2] We further note, Ms. Duhon has not requested that we address the general damage amounts awarded by the jury.

-7-

copy of the complained of judgment. The Olivers attached a copy of the December 30, 2008 judgment reducing their recovery to the amount of the cap. An appeal from this judgment, therefore, was timely perfected by the Olivers. We find no merit in Ms. Duhon's peremptory exception of *res judicata*, and it is denied.

**II.  The PCF's Assignments of Error.**

The PCF assigns two errors in the underlying tort judgment: the award of Taylor's past medical expenses and interest on these expenses.

*A.  Medical Expenses.*

The jury awarded Taylor past medical expenses of $629,728.24. The trial court assessed these expenses against the PCF. The PCF complains that the judgment twice references past medical expenses. The first is the specific recognition of the award in the judgment. The second, the PCF argues, is contained in the succeeding paragraph, in which the judgment provides, "[Taylor] is a patient in need of future medical care and related benefits . . . and is thus entitled to receive compensation from The Louisiana Patients Compensation Fund and Oversight Board for all past, present, and future medical and related services."

The obligation of the PCF to pay "future medical care and related expenses" is governed by La.R.S. 40:1299.43, which reads, in pertinent part:

> B. (1) Future medical care and related benefits for the purpose of this Section means all of the following:
>
> (a) All reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, incurred after the date of the injury up to the date of the settlement, judgment, or arbitration award.
>
> (b) All reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provisions of such services, after the date of the injury that will be incurred after the date of the settlement, judgment, or arbitration award.

(2) Future medical care and benefits as used in this Section shall not be construed to mean non-essential specialty items or devices of convenience.

The plain wording of the statute is clear. Future medical care and related expenses include all related reasonable medical expenses incurred from the date of injury up to the date of judgment, and all such expenses that will be incurred after the date of judgment. Accordingly, this assignment of error is without merit.

*B. Judicial Interest.*

The PCF also assigns as error the award of judicial interest on the past medical expenses. It cites no legal authority for its proposition, other than the fact that a lien for medical expenses in favor of the Department of Health and Hospitals exists. We note, neither La.Code Civ.P. art. 1921, nor our jurisprudence, allow any discretion in the assessment of judicial interest. *See Odom v. City of Lake Charles*, 00-1050 (La.App. 3 Cir. 1/31/01), 790 So.2d 51, *writ denied*, 01-1198 (La. 6/22/01), 794 So.2d 787. We affirm the award of judicial interest.

***III. The Olivers' Assignments of Error.***

The Olivers assert the cap violates a number of provisions of the Louisiana Constitution of 1974: (1) the "due process" and "adequate remedy" provisions of La.Const. art. 1, § 22; (2) the "separation of powers" provision of La.Const. art. 2, § 2; (3) the provisions of La.Const. art. 3, §§ 2 and 12, in that it is a "special law" granting privileges and immunities and changes the method of collecting debts and enforcing judgments; (4) the provisions of La.Const. art. 5, § 16, in that no amendment to the constitution was ever adopted changing the original jurisdiction of the district courts; and (5) the equal protection guarantee of La.Const. art. 1, § 3.

*A. Equal Protection Challenge.*

As can be seen in *Arrington v. ER Physicians Group, APMC*, 04-1235 (La.App.

3 Cir. 9/27/06), 940 So.2d. 777, Plaintiffs in this case are not the first to attack the constitutionality of the MMA as applied to severely or catastrophically injured victims based on the equal protection guarantee found in Article 1, § 3 of the Louisiana Constitution which provides:

> No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.

Although Plaintiffs in this case, like other litigants before them, assert that applying the $500,000.00 MMA cap to reduce the jury's general damage award will result in them receiving an inadequate remedy for the severe harm occasioned by Ms. Duhon's negligence, this legislated consequence alone does not necessarily constitute a violation of Louisiana's constitutional guarantees. The supreme court made it clear in *Everett v. Goldman*, 359 So.2d 1256 (La.1978), unless a fundamental right is impacted or a separate or suspect classification is created, the legislature is constitutionally free to limit damage recoveries or to grant immunities from suit so long as it articulates a rational basis for the discriminatory treatment reasonably related to the governmental interest sought to be advanced. The supreme court has also held that "[t]he right of malpractice victims to sue for damages caused them by medical professionals does not involve a fundamental constitutional right. Thus, it is to be tested by the lesser standard of rational basis." *Id*. at 1268-69. The rational basis offered by the State for applying the cap in this case is the same echoed by it in all the prior cases addressing the limitation on recovery issue. The State maintains the legislative purpose underlying enactment of the MMA's $500,000.00 cap in Louisiana was to assure available and affordable malpractice insurance for healthcare providers, and to prevent flight of these professionals from this State. This purpose, the State

-10-

insists, is still the cap's goal; and, it points out, Louisiana courts, since the cap's enactment, have found it rational and reasonably related to advance the government's interest in assuring accessible healthcare and lower healthcare costs generally for citizens of this State. *Sibley v. Board of Supervisors of Louisiana*, 462 So.2d 149 (La.1985), (commonly referred to as *Sibley I)*; *Everett*, 359 So.2d 1256; *Armand v. State*, 00-1457 (La.App. 1 Cir. 6/21/02), 822 So.2d 671, *writ denied*, 02-2036 (La. 11/1/02), 828 so. 2d 583; *Ruiz v. Oniate*, 00-2105 (La.App. 4 Cir. 12/27/01), 806 So. 2d 81; *LaMark v. NME Hospitals, Inc*. 542 So.2d 753 (La.App. 4 Cir. 1989), *writ denied*, 551 So.2d 1334 (La.1989).

But the "rational basis" offered by the State to ward off constitutional challenges to the cap's application in most cases has not been accepted without more in cases involving severely or catastrophically injured victims. This is because the equal protection right all citizens in Louisiana share, guaranteed in Art. 1, § 3 (emphasis added) of this state's constitution, limits the legislature's authority to infringe upon not only fundamental rights; but, it also limits the legislature's power to enact laws that "arbitrarily, capriciously, or unreasonably discriminate" against its citizens by creating separate or suspect classifications "because of birth, age, sex, culture, *physical condition*, or political ideas or affiliation." When the State *chooses* to provide an "adequate remedy" to some members of a class of victims and denies an "adequate remedy" to other members of the same class because of their *physical condition*, it creates a separate or suspect classification. Legislation that allows some medical malpractice victims to receive full recovery for the injuries they sustained, but limits the recovery of other victims whose injuries exceed $500,000.00 clearly creates two classes of victims. In *Sibley II*, the Louisiana Supreme Court held the MMA's limitation in operation "classifies individuals because of their physical condition." It

-11-

explained:

> The law on its face is designed to impose different burdens on different classes of persons according to the magnitude of damage to their physical condition. The statute creates two classes: One, a group of malpractice victims each of whom have suffered damage that would oblige a defendant under our basic law to repair it by paying in excess of $500,000 dollars; another, a class consisting of victims whose damage would not require an award over this amount to make individual reparation. Victims in the former class are prevented from recovering the allowed full recovery. Damage to the physical condition of each malpractice victim is the primary element of his being assigned to one of the two classes. Thus, the statutory classification disadvantages or discriminates against one class of individuals by reason of or because of their physical condition.

*Id*. at 1108-09.

> This Court further noted in *Arrington*:

> Moreover, not only does the MMA's cap discriminate between victims in the same class, it also creates subclasses of catastrophically or severely injured victims of malpractice by limiting recovery to one award of $500,000. The subclasses are created depending on whether the catastrophically or severely injured patient has a spouse, minor children or parent. For example, as recognized in *Ferdon v. Wisconsin Patients Compensation Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, 446 (2005), a single patient may recover in Louisiana the entire $500,000 while a married catastrophically injured victim must share the cap with his or her spouse and children.

*Arrington*, 940 So.2d at 791-92.

Thus, the Louisiana Supreme Court held in *Sibley II* that the State must articulate more than a "rational basis" for the cap in cases involving severely or catastrophically injured victims of malpractice to avoid Article 1, § 3's constitutional bar to its enforcement. It must also "show that the law does not arbitrarily, capriciously, or unreasonably discriminate against [this] disadvantaged class by demonstrating that the *legislative classification substantially furthers a legitimate state objective*." *Sibley II*, 477 So.2d at 1104.

Taylor is a severely injured victim of malpractice. Her injuries occurred when she was only a baby and will last a lifetime with devastating and debilitating effects

upon her capacity to perform even the most basic human functions. The State offered no evidence in this case, as in the cases prior, to refute the fact that the cap discriminates against Taylor and her parents by limiting their general damage recovery to a single $500,000.00 payment, while allowing other less severely injured victims to fully recover their general damage awards. The State maintains that applying the cap to reduce Taylor's and her parents' general damage awards not only serves the State's purpose in lowering malpractice insurance costs for healthcare providers; but, it thereby furthers the State's legitimate objective in assuring accessible and affordable healthcare for its citizens generally. The State also argues, just as it did in *Butler v. Flint Goodrich Hospital*, 607 So.2d 517 (La.1992), that the Act's $500,000.00 limitation provides three benefits to the severely injured medical malpractice victim which serves as a *quid pro quo*–a reasonable alternative remedy–to offset the MMA's discriminatory impact on the general damage claims of these victims and their families. The State recites in brief that it presented expert testimony by Mr. Bickerstaff, a consulting actuary, showing–just as the supreme court found in *Butler*–the cap benefits this group in three ways: (1) a greater likelihood exists that the offending physician or other healthcare provider will have malpractice insurance; (2) it fulfills the State's legitimate objective of assuring that this group's future medicals will be satisfied; and (3) it assures their claims will be paid from a solvent PCF. In sum, the State argues, "the very *quid pro quo* that was determinative of the constitutionality of the cap in 1992 [when the supreme court decided the equal protection claim raised by this group in *Butler*] continues to exist today." We therefore are obliged, the State urges, to follow the *Butler* holding. We do not believe that holding precludes us from revisiting the equal protection issue plaintiffs advance based on present day realities and the evidence actually presented in this case.

The Supreme Court's holding, nearly eighteen years ago in *Butler*, was based on evidence presented in that case at a time long past. We noted in *Arrington*, the Wisconsin Supreme Court in *Ferdon* , 701 N.W. 2d at 448 (emphasis added), recognized:

> [A] statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. A past crises does not forever render a law valid. Over a period of time social, political, and economic changes may render a statute obsolete. . . . Where changed conditions have rendered a statue unconstitutional, the basis for its abrogation by court action is clear. *It is well settled that the continued existence of facts upon which the constitutionality of legislation depends remains at all times open to judicial inquiry.*

Prior to and since *Ferdon*, many courts in states across this country–including Alabama, New Hampshire, Texas, Georgia, Illinois, North Dakota, and Florida–have not felt so constrained to follow precedence and have refused enforcement of medical malpractice caps based on state constitutional guarantees.

We note further, most states' medical malpractice acts distinguish between economic and non-economic damages; and these states' caps limit *only* non-economic damages. Generally, non-economic damages include pain and suffering, physical impairment, inconvenience, anguish and disfigurement. These damages are more difficult to determine and have often been criticized because juries are left to assign values without much constraints, which in some states have resulted in "run-away awards" and million dollar judgments for minor injuries. Economic damages include lost wages, past medical expenses and future medical expenses. These damages are easier to determine and are subject to mathematical calculation. Louisiana's MMA does not differentiate between economic and non-economic damages. The $500,000.00 cap, when originally enacted in 1975, applied to the "total amount recoverable," including economic and non-economic damages. The cap was amended

in1984 to exclude the cost of "future medical care and related benefits" and these costs are no longer limited but are subject to administrative approval and reviews. There are only four other states with all inclusive caps like Louisiana: New Mexico, Indiana, Nebraska, and Virginia. Indiana, whose medical malpractice act was used as a model by the drafters of Louisiana's MMA, currently provides $1,250,000.00 in recoverable general damages. *See* Ind. Code Ann. 34-18-14-3(a)(3). Louisiana's all-inclusive cap remains the lowest in the nation. *See* Allison B. Lewis, *Unreasonable and Imperfect: Constitutionality of the Louisiana Medical Malpractice Act's Limit on Recovery*, 69 La. L.Rev. 417.

Plaintiffs contend, during the *Sibley II* hearing in this case, "the State did not meet its burden of proof in showing the MMA cap on damages [does] not arbitrarily, capriciously or unreasonably discriminate nor did the State demonstrate that the legislative classification substantially [furthers] a legitimate state objective." Plaintiffs point out there are several empirical studies showing the cap in Louisiana and caps generally across this country have not had their intended effect; and, Louisiana's cap is not furthering a legitimate state objective sufficient to infringe upon Taylor's and her parents' constitutional right to recovery in parity with those malpractice victims who suffer less harm. Plaintiffs also urge the "*quid pro quo*," or alternative remedy theory used by the *Butler* court to balance the unequal general damage recoveries for these victims against those less injured, is no longer viable for several reasons.

The State relies on the expert testimony it adduced from two witnesses during the *Sibley II* hearing and argues the evidence establishes the cap still serves a legitimate state interest and "the very *quid pro quo* that was determinative of the constitutionality of the cap in 1992 continues to exist today." Mr. Bickerstaff testified

-15-

that the capital structure of an insurance company includes its assets and liabilities. Under the liability column are "reserves (consisting of unpaid losses and loss expense amounts); unearned premiums; and miscellaneous expenses." He pointed out the reserves "take up by far the greatest portion" of the insurer's liabilities but these losses are not certain and "can range all over the place." The State notes he testified "that the biggest factor in how wide the range of estimates will be is the policy limit, i.e., the maximum liability of the insurance company under the policy, with a lower policy limit resulting in less variability and therefore less uncertainty in the estimate of the unpaid losses." Thus, in his expert opinion, caps enable insurance companies to more accurately estimate reserves, more precisely charge premiums, and remain solvent to pay losses. In addition to reserves, insurance companies keep "surplus funds" in the event reserves are insufficient to cover its liabilities due to underestimation of losses. Mr. Bickerstaff "explained in the mid to late 1990's the National Association of Insurance Commissioners adopted standardized formulas, called risk-based capital, for determining the minimum surplus a particular insurance company should maintain based on its level of exposure writing various lines of insurance." He also testified because medical malpractice insurance is one of the riskiest lines of insurance, the formula requires significantly more surplus than other insurers offering different lines of coverage are required to withhold. Again, in this expert's opinion, caps enable insurance companies to keep less surplus, to lower premiums, or to *increase the insurance company's dividends*.

Mr. Bickerstaff also created a model which predicts how much typical medical malpractice insurance premiums would rise if the cap was raised to $2,000,000.00 or abolished entirely. The State recites that Mr. Bickerstaff's model was based on information provided by the Louisiana Patient Compensation Fund and LAMMICO

Insurance Company. The State acknowledges that the LAMMICO data relied upon by Mr. Bickerstaff is not in the record of this proceeding; and, we have been unable to locate any data in the record from the Louisiana Patient Compensation Fund supporting Mr. Bickerstaff's estimations or otherwise used by him in creating the model. In constructing the model, Mr. Bickerstaff assumed that the Louisiana Patient's Compensation Fund would cover all future medical expenses and damage awards between $100,000.00 and $500,000.00 as provided by the current cap. If the cap were raised to $2,000,000.00, Mr. Bickerstaff estimated for the excess coverage the average healthcare provider's premium would increase from $10,272.00 to $28,369.00. If the cap was raised to $30,000,000.00 the average provider's premium would escalate to $40,761.00. The premium increases were predictably higher for neurosurgeons and obstetricians, and gynecologists, the higher risk specialties.

Mr. Bickerstaff's model also estimates that 182 claims would exceed the cap leaving the healthcare providers liable for the excess. We are unable to determine from the record or the model created by Mr. Bickerstaff how he arrived at this number, what period of time it covers–years or decades–and no attempt was made by him to estimate the number of claims which might be filed by severely or catastrophically injured victims during the same period. The PCF, though an intervenor and present at the *Sibley* hearing, did not introduce any data or other information documenting the number of severely injured victims filing claims since enactment of the MMA and the medical costs associated with the care of these patients, which has been paid by the PCF since the adoption of the MMA or any other definable period of time. The record is devoid of any evidence showing the number of victims who died shortly after their injuries versus those who survived for years.

The State also elicited testimony from Dr. Bauer, an expert medical economist.

The State asserts that Dr. Bauer's testimony exposes the "fallacy" of Plaintiffs' argument which asserts that any increase in medical malpractice insurance premiums can easily be passed on by doctors to the consumer. It claims Dr. Bauer's testimony could not be clearer that doctors do not have the option to pass on these increased costs. The real "fallacy" of reasoning, however, is demonstrated in examining Dr. Bauer's expert testimony, and the basis, or rather lack thereof, for his conclusions.

Dr. Bauer bases his expert opinion on a comparison of the increase in medical costs from 1975 to 2006 and the increase in "non-medical" costs. From what we are able to surmise from the record, non-medical costs is a very broad category, and Dr. Bauer does not aid us in evaluating the strength of his testimony by disclosing what "non-medical" costs he is using as a comparison, i.e., whether it includes increases in the price of airline tickets, vegetables at the local superette, or tea from China. Experience teaches us that statistics are notoriously prone to manipulation when based on ill-defined categories. Dr. Bauer eventually concludes that a medical malpractice plaintiff was better off economically when recovering damages under the cap in 2006 than in 1975 because, he says, he determined the cost of medical care increased 1.97 times faster than "non-medical" costs. This number, however, is meaningless to us without knowing what "non-medical" costs Dr. Bauer used as a comparison. Even if we were to assume this number is correct, it does not lead us to the conclusion suggested by the State. As the State points out, Dr. Bauer also claims, using his comparison to "non-medical" costs, the differential between 1992 and 2006 was only 1.25, with medical costs increasing at the faster rate. But faster than what? Dr. Bauer relies on national averages for physicians' and surgeons' incomes based on peer-reviewed articles. No mention is made of the figures for physicians and surgeons in Louisiana; yet, based on national average information, Dr. Bauer posits that Louisiana

doctors simply could not afford an estimated $34,000.00 increase in premiums if the cap was entirely eliminated and asserts that they just cannot pass this cost on to consumers. Dr. Bauer testified physicians incomes, presumably nationally, have not increased, but one cannot help but wonder what part did physicians' incomes play in the 1.97 and 1.25 increase in medical costs over the years since 1976. Averaged information based on national data is not very helpful in determining the questions before us and assessing the impact, if any, an increase in the cap might have on Louisiana's healthcare system. Dr. Bauer's conclusions are premised on disconnected leaps in reasoning based on ill-defined data and generalized information. His conclusions are unpersuasive and of little use in determining whether a plaintiff in Louisiana, compensated under the medical malpractice cap, is indeed better off in 2006 than in 1975. Likewise, his conclusions are also unpersuasive and of no use in determining whether doctors could in fact pass along an increase in the cost of medical malpractice insurance premiums, particularly considering they have through the years passed on other increases in overhead perhaps some of which account for the 1.97 and/or 1.25 increase in medical costs when compared to whatever "non-medical" costs Dr. Bauer employed in his analysis.

None of the State's experts took the time to project the premium increase an average healthcare provider would pay if the current cap was maintained, but severely or catastrophically injured victims and their qualifying family members also were allowed to recover economic losses up to a fixed amount–for example, up to $1,000,000.00. In *Arrington* we attempted to encourage the PCF, because of its unique position and statutory duty to "collect, accumulate, and maintain claims experience data from enrolled healthcare providers and insurance companies," to provide us with sufficient documentation in the future to aid us in intelligently

reviewing the record and determining whether the current cap, as applied to limit the general damage claims of severely or catastrophically injured victims, continues to serve a legitimate state interest without trampling on these victims' constitutional right to parity recovery and protection from discrimination.

Nevertheless, there are available published studies which cause us to question the conclusions made by the State's experts. For years the U.S. General Accounting Office (GAO), a non-partisan federal government arm of Congress, has gathered data from sources across this country to evaluate and investigate the underlying factors which contribute to increases in malpractice insurance premiums. One study prepared by it in 2003 concludes that a number of factors affect whether medical malpractice premiums increase or decrease, and there is no definitive correlation between caps on non-economic damages and lower medical malpractice premiums. U.S. General Accounting Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates*, GAO-03-702 (June 2003). *See also*, Health Insurance Association of America, *Issue Brief: Why Do Health Insurance Premiums Rise* (Sept. 2002) (indicating that rising consumer health insurance premiums are due to increases in the overall cost of health care and that "claims and consumer services" account for only 0.12 cents of every dollar spent on healthcare.) In one report, the GAO found differences in premiums and claims payments are affected by other factors–not just caps–such as state premium rate regulations, competition among insurers, interest rates and *income returns on investments by insurers.* In the end, the GAO could not determine whether differences among states in premiums charged by insurers were attributable to the presence or absence of damage caps or to other factors. U.S. General Accounting Office, 03-836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 30 (Aug. 29, 2003). For example, the

GAO notes Minnesota, which has no caps on damages, has comparatively low growth in premium rates and claims payments. *Id.* Further, this Court noted in *Arrington*, "[t]he U.S. Department of Health and Human Services found most victims of malpractice do not file a claim. In fact, only 1.53% of those who are injured even file a claim." *Arrington*, 940 So.2d at 793. Like in *Arrington*, there is nothing in this record to suggest that Louisiana malpractice victims are more litigious than the national average or that Louisiana had a prior history of "run-away" jury awards in malpractice cases.

Plaintiffs also presented expert testimony contradicting the findings and conclusions of the State's experts. Dr. Michael Kurth (an economist) testified, based on studies conducted by the GAO, that medical malpractice premiums account for only 1% of healthcare cost in the United States. He noted the Congressional Budget Office also found that non-economic caps do not appear to impact a doctor's decision to practice medicine in a particular state. He further points out there are no studies or economic data to show: (1) that the cap has improved healthcare in this State; (2) that it has resulted in an increased number of healthcare providers in this State; or (3) that it has improved the quality or cost of healthcare in this State *vis a vis* other states. He was not aware of any data, economic rationale, or crisis eliminated by the continued expansion of the MMA to limit the liability of a host of other healthcare providers since its enactment, including more recently, nurse practitioners. The State straightforwardly admits in brief that the legislature, in limiting the liability of nurse practitioners, did not have available any data suggesting a crisis in healthcare would occur if the cap was not so extended. The State simply excuses this failure by saying "unless and until there is a claim against [a] nurse practitioner in excess of the cap," this data is unavailable–but "at that point in time will demonstrate the existence of a

crisis for nurse practitioners." The State also presented no evidence to show there is a shortage of physicians in this state and a correlating need for nurse practitioners to operate and own "walk-in" clinics to make health care more affordable or available to Louisiana citizens. Mr. Bickerstaff indicated there was statistical data available for nurse practitioners, but he chose, or was not asked, to provide it at the hearing. The following exchange occurred between Mr. Bickerstaff and plaintiffs' counsel:

> Q.    My point is, if you wanted to concern yourself you could have and you're capable as an actuary of getting data to each specialty, whether it's a podiatrist, a chiropractor, or a nurse practitioner, but the data is out there in actuarial science to figure out as it applies to those, correct?
>
> A.    Let me answer it this way.
>
> Q.    Could you answer it first whether the data is there and then you could explain it.
>
> A.    *The data by specialty is available.*
>
> Q.    Okay.
>
> A.    It's available on a statewide basis, it's available on a countrywide basis, it's data that we refer to routinely when we're looking at individual state's rate filings.
>
> . . . .
>
> Q.    Do you have any proof that in 1975 that there was going to be a flight of nurse practitioners, if they weren't covered under this act?
>
> A.    Again, I don't have any specific knowledge of nurse practitioners' plight at the time anymore than I do most any other specialty.
>
> Q.    Do you have any proof on the other side, that this act has improved and allowed there to be more nurse practitioners, or the state is attracting nurse practitioners here who would have gone to other states? Do you have any data for that?
>
> A.    I don't myself. *I think there is data available for that, though.*

A review of jurisprudence across the country shows, when courts have considered similar malpractice caps in response to state constitutional challenges by severely or catastrophically injured victims, they have been troubled by the disparate

impact caps have on this group. As noted, victims with minor injuries or whose claims do not exceed the cap are allowed to recover fully all their economic and non-economic damages; while those who are harmed the most recover minimal damages in comparison. The saddest incidences, perhaps, involve the youngest victims of malpractice who, like Taylor, will in all likelihood reach old age and remain wards of their parents or other family members or of the state in excess of sixty plus years. Taylor's injuries occurred when she was an infant. The cap on the jury's award also leaves Taylor's parents with no possibility of recovering any damages for the harm caused them. Their lives are forever disrupted without any recompense from the tortfeasor.

In *Moore v. Mobile Infirmity Association*, 592 So.2d 156 (Al. 1991), the Alabama Supreme Court invalidated a $400,000.00 cap on non-economic damages based on its finding that the link between damages caps and health care costs was remote. The *Moore* court found the State failed to show a reasonable means/ends fit between caps and the asserted purpose of alleviating the effects of the alleged malpractice crisis. That court, in reviewing available empirical data, held there was insufficient evidence that the enactment of medical malpractice damages caps leads to a decrease in insurance premiums or an improvement in the availability of health care services. The *Moore* court was particularly concerned by the legislative attempt to balance the "direct and palpable burden placed upon catastrophically injured victims of medical malpractice against the indirect and speculative benefit that may be conferred on society." *Id.* at 170.

In *Brannigan v. Usitalo*, 587 A.2d 1232 (N.H. 1991), the New Hampshire Supreme Court invalidated on equal protection grounds an $875,000.00 non-economic damages cap. That court held when a statute creates a classification interfering with

the right to recover for personal injuries, the classification may not be unreasonable or arbitrary, and must have a "fair and substantial relation to the object of the legislation." *Id*. at 1234 (quoting *Carson v. Maurer*, 424 A.2d 825, 831 (N.H. 1980) where the same court found a $250,000.00 cap unconstitutional). The New Hampshire Supreme Court in *Carson*, 424 A.2d 825, 837, recognized, while medical malpractice caps serve an important societal goal, it is still "unfair" to force a class of the most severely injured patients to support the entire medical industry through a reduction in damage awards.

We also find particularly interesting the series of events which have occurred in Wisconsin. In 1975, the Wisconsin legislature created the Wisconsin Patient Compensation Fund in order to stabilize the insurance market by providing a layer of coverage beyond that obtained from private insurers. Subsequently, in 1986, the Wisconsin legislature adopted a cap of $1,000,000.00 in non-economic damages that limited the Wisconsin PCF's liability. That cap expired in 1991. In 1995, the Wisconsin legislature adopted a cap of $350,000.00 (adjusted for inflation) on non-economic damages in medical malpractice cases.

In *Ferdon*, 701 N.W.2d 440, Matthew Ferdon, who was injured at birth, causing his right arm to be partially paralyzed and deformed, brought a medical malpractice claim against the doctor and hospital. Mr. Ferdon was awarded by a jury $700,000.00 in non-economic damages. The trial court reduced this award to the statutory limit of $410,322.00 (the $350,000.00 cap adjusted for inflation). Mr. Ferdon appealed, and the Wisconsin Court of Appeals affirmed. The Wisconsin Supreme Court reversed, declaring the cap unconstitutional under the equal protection clause of the Wisconsin Constitution. The opinion identified five legislative objectives of the statutory cap, and concluded the cap was not rationally related to achieving any of those objectives.

-24-

First, the court explored "whether a rational relationship exists between the legislative objective of compensating victims fairly and the classification of medical malpractice victims into two groups – those who suffer noneconomic damages under $350,000 and those who suffer noneconomic damages over $350,000." *Id.* at 97. The court emphasized that, as structured, "the burden of the cap falls entirely on the most seriously injured victims of medical malpractice," and accordingly, "no rational basis exists for treating the most seriously injured patients of medical malpractice less favorably than those less seriously injured." *Id.* at 98, 102.

Next, the *Ferdon* court examined whether there was a rational relationship between the cap and "[p]roviding reasonably priced medical malpractice insurance for health care providers." *Id.* at 106. Relying on several published studies, the court concluded that "medical malpractice insurance premiums are not affected by caps on noneconomic damages." *Id.* at 123.

Third, the court discussed whether the cap on non-economic damages was rationally related to the legislative function of keeping the Wisconsin PCF operating on a sound financial basis. Finding the PCF "flourished both with and without a cap," the court found "the rational basis standard requires more to justify the $350,000 cap as rationally related to the [PCF's] fiscal condition." *Id.* at 158.

Fourth, the court explored whether the cap was rationally related to the legislative objective of lowering overall health care costs. The court pointed out that "even assuming that a $350,000 cap affects medical malpractice insurance premiums and the [PCF's] assessments on health care providers, *medical malpractice costs are an exceedingly small portion of overall health care costs.*" *Id.* at 162 (emphasis added). The court concluded such a reduction, if it in fact existed, "would have no effect on a consumer's health care costs." *Id.* at 165.

Finally, the court in *Ferdon* examined the issue of physician flight. The court discussed studies which indicated "that caps on noneconomic damages do not affect doctors' migration," and thus, the cap was not "rationally related to the objective of ensuring quality health care by creating an environment that health care providers are likely to move into, or less likely to move out of, in Wisconsin." *Id.* at 168, 171.

Not surprisingly, there was legislative reaction to *Ferdon*, and in 2005, the Wisconsin legislature passed a bill adopting a cap of $550,000.00 on non-economic damages for victims under eighteen years of age and $450,000.00 for adults. However, this bill was vetoed by the Governor of Wisconsin. Subsequently, the legislature passed a $750,000.00 cap on non-economic damages, and that bill was signed into law. The interests which the State in this case insists are served by Louisiana's cap are the same ones many of the courts and the GAO have found lack scientific basis to correlate with actual healthcare costs and malpractice insurance premiums.

However, the State suggests somehow that Louisiana's equal protection and anti-discrimination guarantees in the Constitution offer no relief to these plaintiffs because, as found in *Butler*, the MMA provides these victims with offsetting benefits to its $500,000.00 limitation. The State argues any discrimination against those with excessive injuries is accompanied by a *quid pro quo*: a reasonable alternative remedy. *See Bazley v.Tortorich*, 397 So.2d 475 (La.1981). Since the legislature's statutory solution to the medical malpractice problem also furthers the State's purpose of compensating victims, the State urges, the cap is not constitutionally infirm. Plaintiffs maintain that this purpose is not being furthered by a cap which has existed for well over thirty-four years without any adjustment for inflation. They point to the declining purchasing power of the dollar during this period and inflation which has reduced the

cap to one quarter of its value in 1975. Dr. Kurth testified that the purchasing power of the $500,000.00 cap has dwindled to only $125,000.00 from the date of its enactment to the present. On the other hand, the State relies on Dr. Bauer's testimony and attempts to convince us that "because of the increasing dollar cost of medical goods *vis a vis* non-medical goods and services, and because of the increasing benefits obtained from medical care from 1975 and 1992 to the present, a severely injured victim of malpractice is actually economically and physically better off recovering medical malpractice damages now than in 1975 and 1992." As we have already noted, Dr. Bauer's conclusions are not supported by any data introduced as evidence in this record, leaving us to rely on common sense and our own experiences. We find it difficult to accept that young Taylor and her parents are better off today than they would have been if her injuries had occurred in 1974; and we are certain if Taylor and her parents could travel back in time, they would gladly refuse the increasing medical benefits the State alludes to in return for competent medical care when Taylor was first examined. The medical profession will profit for many years to come from the medical costs generated by Ms. Duhon's malpractice. The State believes it praiseworthy that Taylor's medical care costs will be paid. Taylor did not cause her injuries, a medical practitioner did, and yet, it is the medical profession which will continue to profit from this medical malpractice while the meager sum recoverable under the cap would steadily dwindle in value. It would be praiseworthy if the medical profession, like other professions, provided Taylor's future medical care *pro bono* instead of at an escalating profit.

The State also claims the cap provides an alternative remedy to the severely injured victim by assuring that healthcare providers will have malpractice insurance and these victims will recover damages and medicals from a solvent fund. As noted

by Dr. Kurth and the GAO, there are no definitive studies or evidence supporting the State's conclusion that malpractice caps translates into lower premium cost for the average health care provider. Further, the PCF introduced no data in this record to show that providing more equitable relief to the severely injured victim would compromise the stability of the fund and health care generally in this State.

*B. Adequate Remedy*

Louisiana Constitution Article 1, § 22 provides:

All courts shall be open, and every person shall have an adequate remdey by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.

As noted by Chief Justice Calogero in *Everett*, 359 So. 2d at 1268, La.Const. art. 1, § 22, "like the fourteenth amendment to the United States Constitution, protects fundamental interest to a greater extent than interests that are not considered of fundamental constitutional importance." But a pure dollar for dollar "adequacy test" is not the proper constitutional calculation to determine whether Taylor's constitutional right to an adequate remedy in this case has been violated. As we have noted, in many instances, other than cases involving malpractice victims, the Louisiana legislature has acted to limit recovery of damages to all victims within a class, such as workers' compensation, and to provide the State's tort liability shall not exceed $500,000.00. Additionally, in some cases, "a Plaintiff's right to recover damages *at all* is barred by legislative grants of immunity from suit." See La. R.S. 9:2795. Constitutional challenges to such enactments have not been successful because courts have held that the right to recover damages for tort injuries is not fundamental, and the legislature is only required to articulate a rational basis for limiting or denying such recovery.

But when the legislature chooses to create a "separate or suspect" classification,

as in this case, based solely on Taylor's severe disability, and to limit her damages while allowing other malpractice victims to recover fully, it must do more than "say its all good for the public welfare." Like in instances involving equal protection infringements, it must show such monetary discrimination serves a compelling state interest. For reasons which we have already articulated above, we find the State has not satisfied its burden in this particular case. Therefore, enforcement of the MMA's cap to limit Taylor's and her parents' right to an adequate remedy violates Article 1, § 22 of the Louisiana Constitution.

*C. Separation of Powers*

Plaintiffs argue the MMA's cap violates the separation of powers doctrine established in Article 2, § 1, 2, and Article 5, § 16(A)(1) of the Louisiana Constitution. While courts in other states have found that medical malpractice caps violate separation of powers guarantees between the branches of government because it strips the judiciary or juries of the authority to determine the facts and damages, we find it unnecessary to resolve the issue at this time. *Lebron v. Gottlieb Memorial Hospital*, 930 N.E.2d 895 (Ill. 2010); *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 691 S.E.2d 218 (Ga.2010).

We also have considered the State's reliance on the same doctrine to insist that this court does not have the authority to declare the MMA's cap, as applied to Taylor's claim, unconstitutional because: (1)the legislature has spoken; and (2) the supreme court has already declared that the MMA is constitutional. At oral argument, the State's counsel could hardly contain his excitement to return to the highest court of this State should this Court decide to meddle in a matter he openly suggested was outside our scope of review.

Louisiana Constitution Article 2, § 1 of the provides that the three branches of

state government are the executive, the legislative and the judicial. Louisiana Constitution Article 2, § 2 provides that neither branches nor anyone holding office in any of them may exercise power belonging to either of the others. Louisiana Constitution Article 5, § 16 defines the constitutional role of district courts. The power to determine the constitutionality of legislative enactments, to administer justice, and to protect every person's right to due process of law and an adequate remedy in an open court is vested in the judiciary which includes the district, appellate, and supreme courts. La.Const. art. 1., § 22.

We do not share the State's enthusiasm for the merits of its position. We have taken the opportunity on remand to re-examine Louisiana's Constitution and a long line of jurisprudence addressing separation of powers issues involving our three branches of government, and we are unable to find any which remotely suggests we are powerless to act in this instance. It is our duty to act whenever a litigant's constitutional right is infringed upon by legislative creation of a "separate or suspect" classification; and, as in this case, the evidence is insufficient to establish a compelling State interest giving reason for such interference.

### IV. Overly Broad Procedural Objection.

The State also interposes a procedural objection to Plaintiffs' constitutional challenge. The State argues, as it did below, that Plaintiffs failed to specifically plead that La.R.S. 40:1299.41 was "overly broad" in including and limiting the liability of nurse practitioners. This failure, the State insists, bars Plaintiffs from challenging the cap's constitutionality based on its application in cases involving claims lodged against nurse practitioners owning and operating clinics in this state. Despite not being convinced of the State's arguments on the constitutionality issue, the trial court accepted a belated "specificity" attack and concluded the petition was barred for

"procedural insufficiency."

We do not agree that Plaintiffs' petition was procedurally insufficient. Plaintiffs, in their Petition for Declaratory Judgment, attacked the entire MMA, specifically requesting that the court "declare the limitation on recovery imposed by the Louisiana Medical Malpractice Act, La. R.S. 40:1299.42(B) to be unconstitutional." They also alleged the "*unconstitutionality of La.R.S. 40:1299.41, et seq.*" As we noted in *Arrington v. Galen-Med, Inc.*, 04-1235, p. 2 (La.App. 3 Cir. 7/6/07), 970 So.2d 540, 541-42, *writs denied*, 07-1614, 07-1628 (La. 12/7/07), 969 So.2d 630, 631 (emphasis added), the Louisiana Supreme Court has said:

> [O]ur Code of Civil Procedure does not require a single procedure or type of proceeding for challenging or assailing the constitutionality of a statute." [*Vallo v. Gayle Oil Co., Inc.*, 94-1238 (La. 11/20/94), 646 So.2d 859,] 864. The requirement that the unconstitutionality of a statute must be specially pled and the grounds for the claim particularized is a jurisprudential one designed to prompt a "contradictory hearing, wherein all parties will be afforded the opportunity to brief and argue the issue." *Arrington*, 947 So.2d at 726 (*quoting Vallo*, 646 So.2d at 865). The ultimate purpose of this rule, as explained by the supreme court, is that "[t]he record of the proceeding could then be reviewed to determine whether the party attacking the statute sustained his or her burden of proof, and *whether the trial court attempted to construe the statute so as to preserve its constitutionality.*" *Id*.

Plaintiffs did not attack the MMA's constitutionality by alleging it was overly broad by including nurse practitioners. A constitutionality attack for "over-breadth" seeks to "demonstrate from the text of the challenged statute and from actual fact that a substantial number of instances exist in which the statute cannot be applied constitutionally." *See St. Mary Anesthesia Assocs., Inc. v. Hosp. Servs. Dist. No. 2 of Parish of St. Mary*, 01-2852, p. 6 (La.App. 1 Cir. 12/20/02), 836 So.2d 379, 388, *writ denied*, 03-220 (La. 3/28/03), 840 So.2d 577. The constitutional doctrine of "substantial over-breadth" is generally applied only in First Amendment cases and requires a showing of a realistic danger that the statute will compromise recognized

First Amendment protections. Over-breadth is not applicable in the instant case. Here, Plaintiffs clearly alleged "equal protection" as grounds for finding the MMA in its entirety unconstitutional as applied to severely injured patients. The trial court was not prevented from reviewing the MMA to determine if all or part of it was constitutional.

The MMA has a severabilty clause in order to maintain constitutionality in part, even if certain provisions are found not to meet constitutional muster. That precisely was what the trial court declared in its original ruling. It severed nurse practitioners as a covered group from the MMA, as is statutorily allowed, in order to maintain the constitutionality of the remainder of the MMA. The pleading requirements do not mandate that Plaintiffs cite every provision of the MMA in attacking its constitutionality. It is the courts' responsibility in reviewing the MMA to uphold all portions of the act wherever possible, except the portions that violate the constitution.

The test for determining the severability of a statute's provisions is whether an unconstitutional provision in a statute is so interrelated and connected with the constitutional provisions that these provisions cannot be separated without destroying the intention manifested by the legislature in passing the act. *Cobb v. Louisiana Bd. of Insts.*, 237 La. 315, 111 So.2d 126 (1958). In this case, severing nurse practitioners as a group covered by the cap will not destroy the protection afforded the principal group, namely doctors, that the legislature was attempting to protect at the time of the MMA's adoption.

Still, the State argues, when the MMA was enacted the legislature intended to include within its protection nurse practitioners because registered nurses were included from the inception of the MMA. We are not at all convinced that the legislature, in including registered nurses in the MMA from inception in 1975, ever

intended to include nurse practitioners as qualified healthcare providers. The State argues since nurse practitioners are registered nurses, and registered nurses have always been listed as qualified health care providers, then it follows the legislature always intended to apply the cap to nurse practitioners. Although it is true nurse practitioners must be registered nurses, the statutes clearly indicate their job responsibilities are significantly different. Louisiana Revised Statutes 37:913(13) (emphasis added) specifically provides that "[t]he practice of nursing or registered nursing *shall not be deemed to include acts of medical diagnosis or medical prescriptions of therapeutic or corrective nature*." However, that statute was amended in 1996 and now provides that "[a]dvanced practice registered nursing may include certain acts of medical diagnosis, in accordance with R.S. 37:913(8) and (9), or medical prescriptions of therapeutic or corrective nature...." La.R.S. 37:913(3)(b). Registered nurses are not permitted to render a medical diagnosis or prescribe medications.

## CONCLUSION

In *Arrington*, this court instructed the State that it must do more than simply rely on prior jurisprudence upholding the constitutionality of the MMA's cap. It must present readily available evidence to show the cap continues to serve a legitimate public purpose and that a reasonable basis still exists for maintaining the discriminatory classification affecting a plaintiff's right to full recovery in medical malpractice cases. This burden, as was clearly set forth in *Sibley*, rests with the State.

The State simply did not meet its burden of establishing that the cap on damages, as it applies to nurse practitioners, is rationally related to any of the enunciated objectives set forth by the legislature when creating the cap. For the reasons set forth, we conclude the cap, to the extent it includes nurse practitioners

within its ambit, violates the equal protection and adequate remedy guarantees of the Louisiana Constitution. Benefit to the public may be a rational basis for a discriminatory classification, but the more speculative and remote the benefit, the more arbitrary is the discrimination. In this case, any correlation between the protection of nurse practitioners by including them under the purview of the cap and any corresponding benefits to the health care system has not been established. The State has not set forth any legitimate basis, under whatever level of scrutiny the constitutional issue before us is examined, for discriminating against severely and catastrophically injured victims by forcing them to shoulder the economic burden for yet another group of healthcare providers who cause them harm. Ms. Duhon owned and operated a clinic and provided medical care to the unsuspecting public without consulting with a physician and without the years of formal study required to become one; yet she held herself out as fully capable of caring for Taylor who appeared ill and in pain thirty-two times at her clinic–not once did she pause to question her skills or seek advice from a physician. Her decision not to do so has caused severe and permanent harm to Taylor. She now complains a judgment against her in excess of the cap will "put her out of business." The Louisiana Association of Nurse Practitioners has also filed an amicus brief in her defense, specifically noting "the scope of practice for nurse practitioners continues to expand and develop nationally and under Louisiana law." The brief recites "when [nurse practitioner] care is compared with that of other providers such as physicians, [nurse practitioner] patients are more satisfied with their care and say that, in addition to providing excellent healthcare, their [nurse practitioner] excels in giving health advice." Ms. Duhon did not attend any institution of higher learning; and, her gross negligence and incompetence has caused Taylor severe harm and burdened her parents for the duration of their lives. The cap, if

enforced in this case, will reward Ms. Duhon's wilful failure to follow the professional rule of her own sub-specialty, which requires that she provide patient care in consultation with a physician, and she will be free to open her doors and repeat her failures in caring for another child.[3]  We do not believe a rational basis exists in fact to warrant insulating her from full liability for the severe harm she has caused; and, the State has failed to provide any evidence or otherwise to convince us that a legitimate state interest is furthered by allowing nurse practitioners as a group to hang their shingles and to operate clinics across this state without direct supervision by a physician.

This case presents a compelling example of the most pernicious consequence of capping the liability of malpractice tortfeasors.  Taylor is unfortunately a member of the two classes which are most discriminated against by a cap on recoverable damages: the severely injured plaintiff, and one who is also young and will have to live with her injuries and disabilities for the remainder of her life.  Spread out over the expected lifetime of a young child such as Taylor, the award of $500,000.00 shrinks to relative insignificance and will continue to decrease as inflation erodes the value of the allowable award.  There simply is no rational reason why the most severely injured malpractice victims should be singled out to pay for special relief for a nurse practitioner who operated in derogation of her statutorily mandated duties.

The legislature, when it decided in 2009 to expand the MMA's cap to limit the liability of nurse practitioners, did not articulate any basis for their inclusion, and the State has offered little more as evidence in this record.   We will not supply this

---

[3] Many have argued the presence of a cap serves to negate the deterrent effects of tort law. There is little incentive, if any, for healthcare providers to decrease the occurrence of malpractice incidents, because the cap serves to decrease the real value of a provider's liability, and, as such, provides extensive protection and shields negligent healthcare providers from even their grossly negligent acts.  This effectively thwarts one of the key purposes the MMA was designed to achieve, i.e., the providing of fair and adequate relief to innocent malpractice victims.

evidence for them nor remand this case for another *Sibley II* hearing. We are satisfied all the interested parties were fully apprised and aware of the constitutional issues presented—this is not the first case challenging the continued application of the cap in cases involving severely or catastrophically injured victims based on equal protection and other grounds.

## DECREE

For the reasons set forth above, the judgment of the trial court awarding the Olivers past medical expenses and judicial interest to be paid by the PCF on those past medical expenses is affirmed. The trial court award of future medical costs to be paid by the PCF is also affirmed. We deny Susan Duhon's peremptory exception of *res judicata*. Lastly, we conclude the cap, to the extent it includes nurse practitioners within its ambit, violates the equal protection and adequate remedy guarantees of the Louisiana Constitution and La.R.S. 40:1299.41(A)(1), and, thus, is unconstitutional.[4] Therefore, the jury's award of damages is reinstated. Costs of this appeal are assessed to Defendants.

**AFFIRMED IN PART; REVERSED IN PART; EXCEPTION OF RES JUDICATA DENIED.**

---

[4] We note that nurse practitioners are still covered under the MMA to the extent an injured party's damages do not exceed the cap, but that any excess liability is not covered by the MMA.

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**09-439**

**JOE OLIVER, ET AL.**

**VERSES**

**MAGNOLIA CLINIC, ET AL.**

**SAUNDERS, Judge, concurs in the result and assigns written reasons.**

I concur in the result for the reasons assigned in *Oliver v. Magnolia Clinic*, 09-439 (La.App. 3 Cir. 11/17/10), 51 So.3d 874.

NUMBER 09-439

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JOE OLIVER, ET AL.

VERSUS

MAGNOLIA CLINIC, ET AL.

AMY, J., dissenting.

I respectfully dissent from the majority opinion, as I find that an affirmation is warranted.

This case presents the issue of whether the Medical Malpractice Act's limitation on recovery pursuant to La.R.S. 40:1299.42(B) is constitutional. Chiefly, the plaintiffs question whether that cap violates the equal protection requirements of La.Const. art. 1, § 3 and the requirement of La.Const. art. 1, § 22 that all persons shall have an adequate remedy by due process of law.

Given the factors before this court, I find no violation of these constitutional requirements. Instead, I conclude that this matter is controlled by *Butler v. Flint Goodrich Hosp. of Dillard Univer.*, 607 So.2d 517, 518 (La.1992), *cert. denied*, 508 U.S. 909, 113 S.Ct. 2338 (1993), wherein the supreme court addressed "the constitutionality of Louisiana's $500,000 cap on general damages in a medical malpractice victim's suit against multiple defendants." The supreme court observed that the statutory cap on medical malpractice judgments in excess of $500,000 distinguishes between injured parties who are fully compensated insofar as their damages are less than $500,000 and those who have damages exceeding $500,000. *Id.* While the former group receives full compensation for their injuries, the latter group is fully compensated only for their medical expenses and related benefits. Recognizing the disparate treatment afforded the latter group, the

supreme court concluded that those with the most serious injuries received three

benefits from the cap:

> (1) greater likelihood that the offending physicians or other health care provider has malpractice insurance; (2) greater assurance of collection from a solvent fund; and (3) payment of all medical care and related benefits.

*Id.* at 521. It noted that compensation and full medical care are legitimate social

interests furthered by malpractice legislation. Thus, the supreme court concluded

that the $500,000 cap was not constitutionally infirm and, instead, the malpractice

act was found to be "a reasonable but imperfect balance between the rights of

victims and those of health care providers." *Id.*

The fact that the malpractice cap does not allow full compensation for

certain malpractice claimants remains unchanged since *Butler*. To the extent the

plaintiffs assert that any under-compensation necessitated by the application of the

cap has only increased since *Butler*, I point out that *Butler* did not focus on the

valuation of the cap's limitation. The supreme court instead addressed the

constitutional permissibility of a limitation.

Both at the time of *Butler* and in the present day, some malpractice

claimants with serious injuries recovering under the Medical Malpractice Act have

received or will receive a larger percentage of compensation than others. For

instance, a victim sustaining damages only slightly above $500,000 would receive

proportionally far greater compensation than the victim who sustained damages

greatly in excess of that limit. Even in light of this inevitable result of the

monetary limit, the supreme court found the cap constitutional in *Butler*. In my

opinion, the supreme court's determination as to constitutionality remains fully

applicable. I believe that the extent of under-compensation, whether due to

inflation or otherwise, remains a policy question outside the reach of this

intermediate court of appeal in light of what I believe to be controlling jurisprudence from a superior court.

Accordingly, I believe that an affirmation of the trial court's judgment is warranted.

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

09-439

JOE OLIVER, ET AL.

VERSUS

MAGNOLIA CLINIC, ET AL.

**GREMILLION, Judge, dissenting.**

Because I believe *Butler v. Flint Goodrich Hosp.*, 607 So.2d 517 (La.1992), is controlling, I subscribe to the dissent of Judge Amy.

In light of *Butler*, it is perplexing that our courts continue to revisit this issue at all. This seems perplexing to the supreme court, too, if one considers its recent pronouncements. Our colleagues on the Fourth Circuit Court of Appeal faced a challenge to the constitutionality of the three-year prescriptive period in medical malpractice claims. *See* La.R.S. 9:5628. In *Russo v. Kraus*, 10-178-79 (La.App. 4 Cir. 9/29/10), 49 So.3d 941, the plaintiffs asserted a claim against a pathologist for failure to identify cancerous cells in a biopsy performed eight years before definite malignancy was diagnosed. The plaintiffs instituted a medical malpractice action and filed a petition for declaratory judgment holding the prescriptive period unconstitutional on the basis of equal protection and due process.

The trial court, as did the trial court in the present matter, scheduled a *Sibley* hearing. Before the hearing, the defendants filed exceptions of prescription and two motions for summary judgment. The trial court decided to hold the hearings on the exception and motions before holding the *Sibley* hearing. The motions for summary judgment were granted and the exception of prescription was not heard. The parties

1

then entered into a stipulation that the claim was prescribed under Revised Statute 9:5628, but reserved the plaintiffs' right to appeal. The trial court then granted the exception of prescription. Plaintiffs then appealed, arguing, among other things, that the trial court erred in ruling on the motions and exception without holding the *Sibley* hearing.

The fourth circuit reversed the trial court. Despite the supreme court's rulings in *Crier v. Whitecloud*, 469 So.2d 304 (La.1986) that the statute did not violate equal protection, and in *Branch v. Willis-Knighten Medical Center*, 92-3086 (La.4/28/94), 636 So.2d 211, *overruled on other grounds*, *David v. Our Lady of the Lake Hospital*, 02-2675 (La. 7/2/03), 849 So.2d 38, which held that the statute furthered a legitimate state interest, the fourth circuit held that the prescriptive statute did not further any legitimate state interest and violated equal protection and due process in denying plaintiffs access to the courts. It remanded the case to the trial court to determine whether any malpractice insurance crisis existed in 1975 or at any point at which the statute had been amended.

Writs were granted by the supreme court. *Russo v. Kraus*, 10-2463 (La. 1/28/11), 52 So.3d 876. The order stated (emphasis added):

> Writ granted. In light of the defendants' stipulation to the latency of Janice Russo's disease **and this Court's prior findings concerning the existence of a medical malpractice insurance crisis in the 1970s**, the Court of Appeal erred in reversing the District Court's judgment and remanding this matter for a *Sibley v. Board of Supervisors of Louisiana State University*, 477 So.2d 1094 (La.1985), hearing on these issues. *See Crier v. Whitecloud*, 496 So.2d 305, 308–09 (La.1986); *see also, Branch v. Willis–Knighton Medical Center*, 92–3086, pp. 9–10 (La.4/28/94), 636 So.2d 211, 215, overruled on other grounds in *David v. Our Lady of the Lake Hospital*, 02–2675 (La.07/02/03), 849 So.2d 38. Accordingly, the judgment of the Court of Appeal is hereby reversed, and the judgment of the District Court is hereby reinstated.

*Id.*

I wish to also address the majority's attempt to limit the scope of its ruling. It

2

takes pains to state that its decision is limited in its application to nurse practitioners. However, this is problematic for two reasons. First, the Olivers never assigned as error the application of the cap to nurse practitioners; rather, they want this court to declare that the cap itself, by virtue of its diminished value, is unconstitutional. We are generally precluded from considering issues not assigned as error. *See* Uniform Rules-Courts of Appeal Rules 1—3 and 2—12.4.

Second, the majority's reasoning is not limited to the circumstances of nurse practitioners. It could apply to any health care provider. In fact, it specifically takes aim at health insurers' "dividends," doctors' "incomes," and the alleged "escalating profit" of the entire "medical profession."

Furthermore, if the cap applies to nurse practitioners, its unconstitutionality necessarily affects all other qualified health care providers. I believe the cap does apply to nurse practitioners. Coverage of nurse practitioners by the MMA, and more specifically their status as qualified health care providers, was raised again in oral argument. It was noted that the legislature recently enacted Act 14 of the 2009 Regular Session, amending La.R.S. 40:1299.41 effective August 15, 2009, to include nurse practitioners among those providers specifically listed in the definition of "health care providers." The significance of this amendment is that, were nurse practitioners not already covered by the act, the cap would not apply retroactively to Duhon.

The cap, which has gone without adjustment for 34 years, should be adjusted by the legislature. That the amount of the cap is now worth substantially less than it was in 1975 does not render it constitutionally infirm. Still, the legislature should consider the burden the cap places on its injured citizens and raise it. I also would respectfully suggest that the legislature index the cap in a responsible manner, which

3

would obviate cases like the one before us now.

The critical question before this court is not whether problems with the medical malpractice cap should be addressed. The answer to that questions is clearly, "Yes." Rather, the question, wrongly answered by the majority, is who should address the problem. The answer to that question is not this court, but the legislature.

Therefore, I would affirm the judgment of the trial court declaring the cap constitutional and the jury's verdict awarding damages.